UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CIARDI CIARDI & ASTIN
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
Holly E. Smith, Esquire
Adrienne N. Roth, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA 19103
(215) 557-3550
(215) 557-3551 fax
aciardi@ciardilaw.com
jcranston@ciardilaw.com
hsmith@ciardilaw.com
aroth@ciardilaw.com

OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Michael S. Fox, Esquire
Andrea Fischer, Esquire
Jordanna Nadritch, Esquire
Park Avenue Tower
65 East 55th Street
New York, NY 10022
Direct: 212.451.2256
Facsimile: 212.451.2222
mfox@olshanlaw.com
afischer@olshanlaw.com
jnadritch@olshanlaw.com

| | |
|---|---|
| In Re: | CASE NO. 10-45230 |
| ANCHOR TANK LINES CORP.,<br>Debtor. | CHAPTER 11 |

**MOTION FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING
DEBTOR TO ENTER INTO A SECURED DEBTOR IN POSSESSION LINE OF
CREDIT, (B) GRANTING PRIORITY ADMINISTRATIVE
EXPENSE CLAIMS AND LIENS SECURED BY PROPERTY OF
THE ESTATE PURSUANT TO SECTIONS 363 AND 364 OF THE
BANKRUPTCY CODE AND (C) SCHEDULING A FINAL**

## HEARING PURSUANT TO BANKRUPTCY RULE 4001

TO THE HONORABLE _____,
UNITED STATES BANKRUPTCY JUDGE:

Anchor Tank Lines Corp., as debtor and debtor in possession (the "Debtor"), respectfully submits this motion (the "Motion") for an order, pursuant to sections 105(a), 361, 362, 363(b)(1) and 364(c)(2) of title 11 of the United States Code (the "Bankruptcy Code"), authorizing to Debtor to enter into a secured Debtor-In-Possession Line of Credit and granting related appropriate relief. In support of this request, the Debtor states:

## INTRODUCTION

1.      On the date hereof (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business and manage its property as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of the case and this Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief the Debtor seeks are sections 105(a), 361, 362, 363(b)(1) and 364(c)(2) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure.

3.      No request has been made for the appointment of a trustee or examiner, and no official committee has yet been appointed in this case.

## BACKGROUND

4. Anchor was established by Leonard Baldari in 1973 with the purchase of one oil truck for $1,300.00. Mr. Baldari continues to act as the President and Chief Executive Officer of Anchor. Today, Anchor employs over 150 employees and is recognized as one of the largest bulk carriers in the tri-state region.

5. The Debtor is located at 19-01 Steinway Street, Astoria, New York 11105 (the "Premises").

6. The Debtor is a Delaware Corporation formed by the merger of the Debtor and Reliable Transit Corp. The Debtor is a multi-line bulk transportation company primarily engaged in transportation of heating oil, cement, asphalt and other materials. Anchor is a major part of the infrastructure and transporter for New York agencies, public utilities, hospitals, schools, airports, asphalt pavers and cement plants.

7. Anchor is the sole bulk cement carrier for John F. Kennedy ("JFK") Airport. Anchor runs twenty-four hours a day, seven days a week supplying cement for the construction ongoing at JFK.

**The Pre-Petition Factoring Agreement**

8. Since September 2008, Prestige Capital Corp. ("Prestige") had been providing the Debtor's financing through an accounts receivable factoring facility. On or about September 17, 2008, the Debtor and Prestige entered into a Purchase and Sale Agreement and, on or about September 26, 2008, the First Amendment To The Purchase and Sale Agreement (collectively, the "Factoring Agreement"). Pursuant to the Factoring Agreement, Prestige had been purchasing certain of the Debtor's accounts receivable (the "Purchased Pre-Petition Receivables") at a discount and maintaining a reserve for various obligations of the Debtor thereunder.

3

9.     Due to certain insolvency related limitations on the recourse provisions in the Factoring Agreement, the sales of accounts receivable thereunder are "true sales" and the Debtor holds no right, title or interest in the Purchased Pre-Petition Receivables.

10.    To secure the Debtor's obligations under the Factoring Agreement (e.g., such as for recourse due to disputed Purchased Pre-Petition Receivables), the Debtor granted to Prestige a security interest in all of the Debtor's accounts receivable and their proceeds, (e.g., accounts receivable not purchased by Prestige), as well as on any property of the Debtor in the possession of Prestige (collectively, the "Pre-Petition Collateral").

11.    As of the Petition Date, the Debtor was indebted to Prestige, without defense, counterclaim, recoupment or offset of any kind, in the aggregate amount of $524,495 as of June 2, 2010 in respect of purchases of Purchased Pre-Petition Receivables, advances and other financial accommodations made by Prestige to the Debtor in accordance with the Factoring Agreement, plus accruing factoring fees and charges, based upon outstanding Purchased Pre-Petition Receivables of $755,534 (the "Pre-Petition Obligations").  Non-Factored accounts total $175,000.

12.    The Pre-Petition Obligations are secured by valid, enforceable and properly perfected first priority liens on and security interests in the Pre-Petition Collateral.

13.    The Debtor negotiated with Prestige and Anchor Tank DLP LLC, ("ATD") to obtain financing for the post-petition cash requirements.

14.    The Debtor has obtained a Line of Credit from ATD to be secured by a first priority lien, on post-petition accounts and junior lien on all other assets.

4

15.     With the protection of the Bankruptcy Court, and the Debtor's ability to continue to obtain financing under the Credit Agreement, the Debtor is confident that it will continue operating in the ordinary course of business while paying its employees and other post petition obligations on a timely basis.

16.     The Debtor has numerous transportation vehicles, inventory, parts, contracts, permits and miscellaneous assets that it plans to sell to Tank Acquisition Company.  The sale of certain assets, described more fully in the Debtor's Sale Motion, will enable the Debtor to fund its plan which will provide for a distribution to secured and unsecured creditors that likely would not be available absent the sale.

17.     ATD has indicated its willingness to loan funds to the Debtor secured by all of the Debtor's accounts receivable on a post-petition basis and make advances and financial accommodations to the Debtor pursuant to the terms and conditions of the Line of Credit, as modified and supplemented by the proposed Interim Order (A) Authorizing Debtor to Enter Into a Secured Debtor-In-Possession Line of Credit, (B) Granting Priority Administrative Expense Claims and Liens Secured by Property of the Estate Pursuant to Sections 363 and 364 of the Bankruptcy Code and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (the "Proposed Interim DIP Order"), which is attached hereto as Exhibit "A," and, thereafter, by a final order on substantially similar terms acceptable to ATD.

## SUMMARY OF THE PROPOSED DIP FACILITY

18.    The significant elements of the Secured Line of Credit Agreement

as modified and supplemented by and the Proposed Interim DIP Order (collectively, the

"DIP Documents") are:[1]

The maximum outstanding loan secured by Post-Petition Receivables shall not at any time (after application of collections calculated on a weekly basis) exceed $1,150,000;

The advance rate shall not exceed 75% of the face value of Eligible[2] Post-Petition Receivables Interest shall be payable monthly in arrears at twenty-four percent (24%) per annum;

Under the Line of Credit Agreement, to secure all amounts owing to ATD, ATD is granted a first priority security interest in all accounts and their proceeds and a junior lien on all other assets.

Under the Proposed Interim DIP Order, the Debtor is granting ATD a super-priority claim and a first priority security interest in all post-petition accounts to secure the Debtor's obligations under the Line of Credit Agreement subject to a certain carve-out for U.S. Trustee fees, certain fees and expenses of any chapter 7 trustee, and certain fees and expenses of professionals retained in this case.

Events of Default.  As set forth in the Proposed Interim DIP Order, the following are Events of Default:

   a.  The Borrower shall fail to pay any (i) principal in respect of any

       Loan when due (whether upon acceleration, at stated maturity, by

       mandatory prepayment or otherwise), or (ii) (A) any interest in

       respect of any Loan, or (B) any other Obligations, in each case

       when due (whether upon acceleration, at stated maturity, by

---

[1] This summary is qualified in its entirety by reference to the provisions of the Credit Agreement and Proposed Interim DIP Order.  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed therein and in the Proposed Interim DIP Order.

[2] Eligible is defined in Credit Agreement

mandatory prepayment or otherwise) and such failure shall

continue for a period of 5 days;

b. Any representation or warranty made under or in connection with this Agreement, the Note, the Security Agreement, or in any other Loan Document shall prove to have been incorrect when made or deemed made;

c. The Borrower shall fail to perform or observe any covenant, agreement or obligation under Sections 2.5, 2.6 and VI hereof;

d. Except as provided in Sections 7.1(a), (b) and (c) of the credit agreement, the Borrower shall fail to perform or observe any other covenant, agreement or obligation contained in this Agreement, the Note, the Security Agreement or any other Loan Document on its parts to be performed or observed and such failure shall remain unremedied for a period of thirty (30) days;

e. The Borrower or any of its Subsidiaries shall fail to pay any Indebtedness in excess of $100,000, or any interest, fees, charges or premiums thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) or any other default under any agreement or instrument relating to any such Indebtedness, or any event shall occur, in each case if the effect of such failure, default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness, or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof;

f. Any judgment or judgments shall be rendered against the Borrower in excess of $100,000 in any single instance or in the aggregate and (i) the amount of any such judgment or judgments, or portions thereof, not covered by insurance shall be in excess of $10,000 or (ii) any such judgment or judgments shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 30 days or more;

g. The Security Agreement shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and void, or shall cease to create a valid, enforceable and perfected first priority security interest and Lien in any of the Collateral purported to be covered thereby, or the Borrower shall so state in writing, or the Borrower shall in any way challenge, or shall bring any proceeding which shall in any way challenge, the prior, valid, enforceable or perfected status of such security interests or Lien or the validity or enforceability thereof;

h. Any authorization, approval, consent or legislation necessary for the Borrower to execute, make, deliver and perform its or his Obligations hereunder, under the Note, the Security Agreement or under any other Loan Document, is modified, revoked or terminated or otherwise does not remain in full force and effect, or for any other reason it is or becomes unlawful for the Borrower to execute, make, deliver and perform any or all of its or his Obligations hereunder, under the Note, or under any other Loan Document;

i. An "Event of Default" shall have occurred under the Security Agreement or any other Loan Document;

j. Any other Loan Document (other than this Agreement and the Security Agreement) shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and void, or the validity or enforceability thereof shall be contested by the Borrower, or the Borrower shall deny it has any further liability or obligation under, or shall fail to perform any of its or his obligations under, such Loan Documents;

k. A Material Adverse Effect shall have occurred;

l. The Borrower's voluntary bankruptcy petition (the "Bankruptcy Case") with the Bankruptcy Court is either dismissed or converted to Chapter 7 of the Bankruptcy Code;

m. A trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

n. Any plan of reorganization of the Borrower is confirmed which does not provide for the payment in full of the Obligations upon the effective date of the plan, unless otherwise agreed by the Lender in its sole and absolute discretion;

o. The Proposed Interim DIP Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall, in the sole opinion of the Lender, materially and adversely affect the rights of the Lender hereunder or shall materially and adversely affect the priority of any or all of the Lender's claims, liens or security interests; or

p. Non-compliance or default by the Borrower with any of the terms and provisions of the Proposed Interim DIP Order.

The Credit Agreement expires July 31, 2010 unless extended by written agreement of the parties or the Court enters a final order approving this financing in form and substance acceptable to ATD prior to such time.

19.     ATD has agreed to an initial advance of $150,000 (the "Fee Advance" to fund professional retainers, which advance shall not be counted against the Advance Rate, and thereafter advance additional sums up to $1,000,000, exclusive of the Fee Advance, on a weekly basis. Total borrowing under the Line of Credit may not exceed $1,150,000.

20.     Martin Rosenman, an affiliate of ATD, advanced the sum of $450,000 to the Debtor, pre-petition, which is secured by a lien on all of the Debtor's assets Junior only to Prestige (the "Rosenman Secured Claim").

21.     The parties contemplate that, as of the Petition Date, Prestige will continue to collect Purchased Pre-Petition Receivables, and will be granted relief from the automatic stay pursuant to section 362 of the Bankruptcy Code to (i) set off against the Pre-Petition Obligations any collections in respect of the Purchased Pre-Petition Receivables, (ii) retain and apply any amounts credited to the existing pre-petition Reserve to the repayment of the Pre-Petition Obligations, free from any claim arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, and (iii) pay any excess to Rosenman on account of the Rosenman Secured Claim.

## AUTHORITY FOR RELIEF

22.     The Debtor seeks authority to enter into the Line of Credit Agreement on a post-petition basis and to grant to ATD the contemplated super-priority claims and senior security interests. Section 363(b)(1) of the Bankruptcy Code provides that the Debtor may use, sell or lease property of the estate, other than in the ordinary course of business, without notice and a hearing. Section 364(c)(2) authorizes the Debtor

to obtain credit secured by a lien on property that is not otherwise subject to a lien. Section 105(a) permits the Court to enter any order that is necessary to carry out the provisions of the Bankruptcy Code to further the Debtor's reorganization efforts.

23.     Under the terms of the DIP Documents which are attached hereto as Exhibits "B" and "C", the Debtor will borrow from ATD in the normal course under a Line of Credit at a lower cost of funds than currently being paid. Therefore, the Debtor believes that the requirements of section 363(b)(1), that the Debtor use its property in the exercise of sound business judgment, is satisfied, and the Debtor should be authorized to continue this practice post-petition.

24.     Under the DIP Documents, the obligations of the Debtor to ATD will constitute super-priority obligations pursuant to sections 105 and 364(c)(1) of the Bankruptcy Code with recourse to all post-petition property of the Debtor and the proceeds thereof, subject only to the carve-out described above.

25.     The terms of the DIP Documents include, among other things, the grant to ATD, pursuant to section 364(c)(2) of the Bankruptcy Code, of a first-priority, valid, binding, enforceable and perfected liens and security interests, in all of the Debtor's presently owned and hereafter acquired Post-Petition accounts and their proceeds (collectively, the "Collateral") (to the extent acquired after the Petition Date, the "Post-Petition Collateral") and a junior lien on all other assets.

26.     The statutory requirement for obtaining post-petition credit under section 364(c) of the Bankruptcy Code[3] is a finding, made after notice and a hearing, that

---

[3] Section 364(c) of the Bankruptcy Code provides that:

If the trustee [or debtor in possession] is unable to obtain secured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

the debtor in possession is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." *See In re Garland Corp.*, 6 B.R. 456, 461 (1st Cir. BAP 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa.), *modified on other grounds*, 75 B.R. 553 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section364(b) of the Bankruptcy Code); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

27.     Where (a) the debtor is unable to obtain unsecured credit on an administrative expense basis pursuant to section 364(b), (b) the credit transaction is necessary to preserve the assets of the estate, and (c) the terms of the transaction are fair, reasonable and adequate given the circumstances of the debtor-borrower and the proposed lender, financing under section 364(c) is appropriate. *See, e.g., In re Aqua Associates*, 123 B.R. 192, 195-6 (Bankr. E.D. Pa. 1991); *Ames Dept. Stores*, 115 B.R. at 37-39.

## Obtaining Credit On An Unsecured Basis

---

(1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

28.     The Debtor submits that it would be impossible to obtain unsecured credit during the pendency of this case as the Debtor has no significant unencumbered assets.  In accordance with Section 364(c), the Debtor represents that it is unable to obtain credit for its operations on an (a) unsecured basis; (b) on the basis of an administrative expense claim; or (c) on any basis more favorable to the Debtor than proposed in the Motion.

29.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of Section 364(c) and (d).  *Id.; see, also, In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

30.     The Debtor's ability to enter into the Line of Credit arrangement with ATD is a critical component of the Debtor's successful chapter 11 case.  The Debtor negotiated with two lenders and is proceeding with the most cost-effective agreement.

**Necessity Of The Financing**

31.     As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtor's management has concluded that the Line of Credit is necessary to preserve the assets of the estate.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  *See, Group of Institutional Investors v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this

Court."); *In re Lifeguard Indus., Inc.,* 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

"More exacting scrutiny would slow the administration of the debtor's estate and increase

its costs, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially."

*Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

        32.     In general, a bankruptcy court should defer to a debtor's business

judgment regarding the need for and the proposed use of funds, unless such decision is

arbitrary and capricious. *In re Curlew Valley Assoc.*, 14 B.R. 506, 511-13 (Bankr. D.

Utah 1981). Courts generally will not second-guess a debtor's business decisions when

those decisions involve "a business judgment made in good faith, upon a reasonable

basis, and within the scope of [its] authority under the Code." *Id.* at 513-14 (footnotes

omitted). *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994)

(noting that the debtor in possession of facilities were approved because they "reflect[ed]

sound and prudent business judgment on the part of TWA . . . [were] reasonable under

the circumstances and in the best interests of TWA and its creditors"); *Cf.*, *In re Simasko

Prod. Co.*, 47 B.R. 444, 449 (D. Co. 1985) ("Business judgments should be left to the

board room and not to this Court"); *In re Lifeguard Industries, Inc.*, 37 B.R. 3, 17 (Bankr.

S.D. Ohio 1983) (same); *In re Curlew Valley Associates*, 14 B.R. 506, 513-14 (Bankr. D.

Utah 1981) (holding that courts generally will not second guess a debtor in possession's

business decision when they involve "a business judgment made in good faith, upon a

reasonable basis, and within the scope of [its] authority under the Code"). In fact,

"[m]ore exacting scrutiny would slow the administration of the Debtor's estate and

increase its costs, interfere with the Bankruptcy Code's provision for private control of

administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

33.     Without the liquidity provided by the Line of Credit, the Debtor will be unable to pay suppliers, employees, and other constituencies that are essential to the orderly operation of their businesses. The Debtor's managers have exercised their best business judgment in negotiating the DIP Documents that is presently before the Court.

34.     No party in interest can seriously contend that the Debtor does not need immediate access to a working capital facility.

35.     Accordingly, access to credit is necessary to meet the day-to-day costs associated with maintaining business relationships with the Debtor's vendors and suppliers, purchasing new inventory, and otherwise financing its operations. Access to sufficient cash is therefore critical to the Debtor. In the absence of immediate access to cash and credit, the Debtor's suppliers will refuse to sell critical supplies and services to the Debtor, and the Debtor will be unable to operate its business. The inability to meet payments to vendors and satisfy customers would seriously impair the Debtor's prospects for reorganization.

**Fairness Of The Financing**

36.     In the Debtor's considered business judgment, the terms of the DIP Documents are reasonable under the circumstances of this case. These terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the Line of Credit facility is to enable the Debtor to meet ongoing operational expenses.

37.     Similarly, the Debtor believes that the various fees and charges required by ATD under the DIP Documents are commercially reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in Section 364 of the Bankruptcy Code.  *See, In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (authorizing credit arrangement under Section 364, including a lender "enhancement fee").  Here ATD is requesting fees lower than Prestige received during nearly two years of ordinary course pre-petition financing of the Debtor.

38.     The Debtor submits that the financing of the Post-Petition Receivables to ATD is fair and reasonable.

39.     In sum, the Debtor has exercised sound and prudent business judgment in determining that post-petition credit is necessary and appropriate, and it has satisfied the legal prerequisites to incur debt.  The Debtor believes that the finance of the Post-Petition Receivables by ATD provides a vital source of working capital, is in the best interests of the Debtor and its estate and is necessary to avoid immediate and irreparable harm.  Entering into the DIP Documents will help to ensure that the Debtor will be able to finance the Post-Petition Receivables on a continuing basis.  In short, without approval of the relief requested, the Debtor will be unable to continue operating.  Accordingly, the Debtor should be granted authority to enter into the DIP Documents and finance its Post-Petition Receivables with ATD.

## NOTICE

40.     No examiner, trustee or official creditors' committee has been appointed in this chapter 11 case.  The United States Trustee, Prestige, the Debtor's 20

largest unsecured creditors and all creditors which the Debtor is aware may assert a lien against its property have been given notice of this Motion. The Debtor respectfully submits that no further or other notice need be provided.

## WAIVER OF MEMORANDUM OF LAW

41.    The Debtors request that the Court dispense with the requirement of Local Bankruptcy Rule 9013-1(b) for a memorandum of law. This Motion does not present a novel issue of law that would require consideration of any authorities other than those set forth herein.

42.    No previous application for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of an order substantially in the form annexed hereto as Exhibit "A" approving and authorizing the DIP Factoring Documents, together with such other and further relief as may be just and proper.

Dated:  June __, 2010

<div style="margin-left:40%">

**CIARDI CIARDI & ASTIN**
Proposed Attorneys for the
Debtor and Debtor in Possession


By:_____
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA 19103
(T) 215-575-3550
(F) 215-575-3551
Proposed Attorneys for the Debtor and
the Debtor-in-Possession

**- and-**
</div>

**OLSHAN GRUNDMAN FROME
ROSENZWEIG & WOLOSKY LLP**


_____
Andrea Fischer (AF 2591)
Park Avenue Tower
65 East 55th Street
New York, New York 10022
(212) 451-2300

772783

Exhibit "A"

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CIARDI CIARDI & ASTIN
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
Holly E. Smith, Esquire
Adrienne N. Roth, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA  19103
(215) 557-3550
(215) 557-3551 fax
aciardi@ciardilaw.com
jcranston@ciardilaw.com
hsmith@ciardilaw.com
aroth@ciardilaw.com

OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Michael S. Fox, Esquire
Andrea Fischer, Esquire
Jordanna Nadritch, Esquire
Park Avenue Tower
65 East 55th Street
New York, NY 10022
Direct: 212.451.2256
Facsimile: 212.451.2222
mfox@olshanlaw.com
afischer@olshanlaw.com
jnadritch@olshanlaw.com

In Re:

ANCHOR TANK LINES CORP.,

Debtor.

CASE NO. 10-45230

CHAPTER 11

**INTERIM ORDER (A) AUTHORIZING DEBTOR TO ENTER INTO A DEBTOR-IN-POSSESSION SECURED LINE OF CREDIT, (B) GRANTING PRIORITY ADMINISTRATIVE EXPENSE CLAIMS AND LIENS SECURED BY PROPERTY OF THE ESTATE PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE AND (C) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

**WHEREAS,** on June 3, 2010 (the "Petition Date"), Anchor Tank Lines Corp., as debtor and debtor-in-possession (the "Debtor") filed a voluntary petition for reorganization pursuant to Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"); and

**WHEREAS,** the Debtor has moved the Court (the "Motion") for authorization, pursuant to Bankruptcy Code §§ 105(a), 361, 362, 363(b)(1) and 364(c), enter into a secured Debtor-In-Possession Line of Credit with Anchor Tank DIP, LLC ("ATD"), pursuant to the terms and conditions of (a) the Post-Petition Line of Credit Documents and all other documents and agreements executed and delivered in connection therewith, each as amended, modified and/or supplemented pursuant to which, among other things, ATD will be granted a superprioirty lien on all post-petition accounts receivable of the Debtor (the "Post-Petition Receivables") and a junior lien on all other assets, and (b) this Order (collectively, the "DIP Documents"); and

**WHEREAS,** an interim hearing having been held before the Court on June __, 2010; and after due deliberation;

**THE COURT HEREBY FINDS AND DETERMINES, ON AN INTERIM BASIS, THAT:**

(a)     ATD is willing to finance certain of the Debtor's accounts (the "Post-Petition Receivables") on a post-petition basis and make advances and financial

accommodations to the Debtor only upon the conditions contained in the DIP Documents;

(b)     the Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(l) as an administrative expense;

(c)     the Debtor is unable to obtain secured credit allowable only under Bankruptcy Code § 364(c), except under the terms and conditions provided in this Order;

(d)     it is in the best interests of the Debtor's estate that ATD be granted a super-priority lien on the Debtor's Post-Petition Receivables and extend credit and financial accommodations to the Debtor under the terms and conditions set forth herein, to prevent a dissipation of the Debtor's assets and to permit the Debtor to achieve a successful reorganization;

## AND THE COURT HEREBY FINDS AND DETERMINES:

(e)     the finance of the Debtor's Post-Petition Receivables pursuant to this Order shall constitute valid and true purchases and sales thereof;

(f)     the finance of the Debtor's Post-Petition Receivables pursuant to this Order and the grant of lien is appropriate;

(g)     the credit and financial accommodations to be extended pursuant to this Order is being extended by ATD in good faith and ATD is entitled to the protection of Bankruptcy Code § 364(e);

(h)     notice of relief sought by the Motion and the hearings with respect thereto, believed by the Debtor to be the best available notice under the circumstances, has been given pursuant to Bankruptcy Rule 4001(c) to the creditors holding the twenty largest unsecured claims against the Debtor's estate, the Office of the U.S. Trustee, ATD

and all creditors which the Debtor believes may have, or may assert, liens against any of its assets, and no further notice of, or hearing on, the interim relief sought in the Motion is required; and

(i)    good and sufficient cause exists for the issuance of this Order, to prevent immediate and irreparable harm to the Debtor's estate;

**NOW, THEREFORE, IT IS HEREBY ORDERED, ON AN INTERIM BASIS:**

1.    The Debtor is hereby authorized and deemed to enter into the Credit Agreement, grant the liens and security interests to ATD thereunder, subject to the rights of a committee and third parties to challenge same to the extent set forth below.

2.    The Debtor is authorized to enter into the Credit Agreement as defined by the following material terms: The maximum outstanding loan secured by Post-Petition Receivables shall not at any time (after application of collections calculated on a weekly basis) exceed $1,150,000; The advance rate shall not exceed 75% of the Eligible Post-Petition Receivables (exclusive of the Fees Advanced) Interest shall be payable monthly in arrears at twenty-four percent (24%) per annum; Under the Credit Agreement, to secure all amounts owing to ATD a security interest in all accounts and their proceeds; and under the Proposed Interim DIP Order, the Debtor is granting ATD a super-priority claim and a first priority security interest in all post-petition accounts to secure the Debtor's obligations under the Credit Agreement subject to a certain carve-out for U.S. Trustee fees, certain fees and expenses of any chapter 7 trustee, and certain fees and expenses of professionals retained in this case and a 3rd priority junior lien on all other assets.

3.      Provided that the Debtor is not in breach of this Order, the Debtor may use ATD's Collateral (as defined below), including cash collateral (as such term is defined in Bankruptcy Code § 363(a)), in the ordinary course of its business, but subject to the limitations set forth below.

4.      Any and all obligations of the Debtor to ATD pursuant to the DIP Documents arising subsequent to the Petition Date, (collectively, the "Post-Petition Obligations" and, the "Obligations") shall have priority in payment over any other obligations now in existence or incurred hereafter by the Debtor, and over all administrative expenses or charges against property of the kind specified in Bankruptcy Code §§ 503(b), 506(c), 507(a) and 507(b), whether arising in the Debtor's Chapter 11 case or in any superseding Chapter 7 case, subject only to the Carve-Out (as defined below).

5.      The super-priority status of the Post-Petition Obligations granted to ATD hereunder are subject and subordinate only to a carve-out (the "Carve-Out") for: (i) statutory fees of the United States Trustee pursuant to 28 U.S.C. § 930(a) and any fees required to be paid to the Clerk of the Bankruptcy Court; (ii) the fees and expenses of a trustee appointed under Bankruptcy Code sections 701, 702, or 703 (such a trustee, a "Chapter 7 Trustee") and by professionals retained pursuant to Bankruptcy Code section 327 by a Chapter 7 Trustee, in the event the chapter 11 case is converted to a case under Chapter 7 of the Bankruptcy Code, in an amount not to exceed $5,000 in the aggregate; and (iii) Court-authorized fees and expenses of professionals retained in the case by the Debtor or committee, not to exceed $25,000 for all such professionals per month and not to exceed $100,000 in the aggregate for the case.

6.     As set forth in the Motion Prestige, will continue to collect Purchased Pre-Petition Receivables, and will be granted relief from the automatic stay pursuant to section 362 of the Bankruptcy Code to (i) set off against the Pre-Petition Obligations any collections in respect of the Purchased Pre-Petition Receivables, (ii) retain and apply any amounts credited to the existing pre-petition Reserve to the repayment of the Pre-Petition Obligations, free from any claim arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, and (iii) pay any excess to Rosenman on account of the Rosenman Secured Claim (All defined terms in this paragraph are defined in the motion).

7.     Pursuant to Bankruptcy Code §§ 361, 362, 363(e) and 364(c), as security for the Post-Petition Obligations, the Debtor is hereby authorized to and does grant to ATD a first priority, valid, binding, enforceable and perfected lien and/or security interest, in all of the Debtor's accounts, whether such property was acquired by the Debtor before or after the Petition Date, and the proceeds and products thereof (collectively, the "Collateral") (to the extent acquired after the Petition Date, the "Post-Petition Collateral") and a 3rd priority junior lien on all other assets. The Post-Petition Collateral shall be subject to the Carve-Out.

8.     The liens, mortgages and security interests granted to ATD hereunder to secure the Post-Petition Obligations shall not be subject to any lien, mortgage or security interest or any other interest, including any lien, mortgage or security agreement which is avoided and which would otherwise be preserved for the benefit of the Debtor's estate under Bankruptcy Code § 551, and the liens, mortgages and security interests granted to ATD hereunder shall encumber and constitute a prior lien,

mortgage and security interest in and to any lien, mortgage or security interest which is avoided and which would otherwise be so preserved for the benefit of the Debtor's estate.

9.    The Debtor waives irrevocably all rights, if any, it might otherwise assert against the Collateral pursuant to Bankruptcy Code §§ 506(c) or 552(b).

10.    No entity in the course of this bankruptcy case, whether Chapter 11 or subsequent Chapter 7, shall be permitted to recover from the Collateral, whether directly or through grant of derivative standing in the name of the Debtor and/or the Debtor's estate, any cost or expense of preservation or disposition of the Collateral, including, without limitation, expenses and charges as provided in Bankruptcy Code §§ 506(c) or 552(b) without the prior written consent of ATD.  No entity shall be permitted to recover from the Collateral, or assert against ATD, any claim with respect to any unpaid administrative expense of the Debtor's bankruptcy case.

11.    So long as there are any Obligations outstanding to ATD, unless ATD shall have given its prior written consent, or the Court enters an order, upon proper notice to ATD and a hearing, requiring that all of the Debtor's Obligations to ATD be immediately satisfied in full, there shall not at any time be entered in the Debtor's Chapter 11 case any further orders which authorize: (a) under Bankruptcy Code § 363, the use of Cash Collateral in which ATD has an interest, or the sale, use, or lease, other than in the ordinary course of business, of other property of the Debtor in which ATD has an interest; or (b) the obtaining of credit or the incurring of indebtedness pursuant to Bankruptcy Code § 364(c) or § 364(d), or any other grant of rights against the Debtor and/or its estate, secured by a lien, mortgage or security interest in the Collateral held by ATD or entitled to priority administrative status.

12.     In addition to the fees, costs, charges and expenses authorized under the Credit Agreement, ATD shall be entitled to charge the Debtor's account or receive reimbursement thereof, in either case as Post-Petition Obligations of the Debtor, on five (5) business days written notice to the Noticed Parties (as such term is defined below) (the "Fee Notice"), but without application to the Court, for all of ATD's reasonable attorneys' and other professionals' fees arising from or related to the DIP Documents, including without limitation the negotiating, closing, documenting and obtaining of Court approval thereof in the amount of $20,000, all proceedings in connection with any Disposition (as such term is defined below), all proceedings in connection with the interpretation, amendment, modification, enforcement or carrying out of the DIP Documents at any time, and all other matters and proceedings arising in or related to the Debtor's bankruptcy case, and all reasonable expenses, costs and charges in any way or respect arising in connection therewith or related thereto.  The Fee Notice shall be accompanied by copies of such professionals' invoices to ATD, subject to redaction against disclosure of privileged and/or confidential information, and such invoices shall be charged to the Debtor's account as provided for herein unless, prior to the expiration of the five (5) business day period, appropriate pleadings objecting thereto are filed with the Court by any of the Noticed Parties scheduling a hearing on such objection, on notice to ATD.

13.     The automatic stay provisions of Bankruptcy Code § 362 are hereby modified to permit (a) the Debtor to implement the terms of the DIP Documents, and (b) the Debtor to create, and ATD to perfect, any and all post-petition liens, mortgages and security interests granted hereunder.  ATD shall not be required to file UCC financing statements or other instruments with any other filing authority to perfect

8

any post-petition lien, mortgage or security interest granted by this Order or take any other action to perfect such post-petition liens, mortgages and security interests. If, however, ATD shall, in its sole discretion, elect for any reason to file, record or serve any such financing statements or other documents with respect to such post-petition liens and security interests, the Debtor shall execute same upon request and the filing, recording or service thereof (as the case may be) shall be deemed to have been made at the time and on the date of the commencement of the Debtor's Chapter 11 case on the Petition Date.

14.    The time of payment of any and all Obligations of the Debtor to ATD shall not be altered, extended or impaired by any plan or plans of reorganization that may hereafter be accepted or confirmed or any further orders of the Court which may hereafter be entered.

(a)    Each of the following shall constitute an "Event of Default" under this Order: The Borrower shall fail to pay any (i) principal in respect of any Loan when due (whether upon acceleration, at stated maturity, by mandatory prepayment or otherwise), or (ii) (A) any interest in respect of any Loan, or (B) any other Obligations, in each case when due (whether upon acceleration, at stated maturity, by mandatory prepayment or otherwise) and such failure shall continue for a period of 5 days;

(b)    Any representation or warranty made under or in connection with this Agreement, the Note, the Security Agreement, or in any other Loan Document shall prove to have been incorrect when made or deemed made;

(c)    The Borrower shall fail to perform or observe any covenant, agreement or obligation under Sections 2.5, 2.6 and VI hereof;

9

(d)     Except as provided in Sections 7.1(a), (b) and (c) of the credit agreement, the Borrower shall fail to perform or observe any other covenant, agreement or obligation contained in this Agreement, the Note, the Security Agreement or any other Loan Document on its parts to be performed or observed and such failure shall remain unremedied for a period of thirty (30) days;

(e)     The Borrower or any of its Subsidiaries shall fail to pay any Indebtedness in excess of $100,000, or any interest, fees, charges or premiums thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) or any other default under any agreement or instrument relating to any such Indebtedness, or any event shall occur, in each case if the effect of such failure, default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness, or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof;

(f)     Any judgment or judgments shall be rendered against the Borrower in excess of $100,000 in any single instance or in the aggregate and (i) the amount of any such judgment or judgments, or portions thereof, not covered by insurance shall be in excess of $10,000 or (ii) any such judgment or judgments shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 30 days or more;

(g)     The Security Agreement shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and

void, or shall cease to create a valid, enforceable and perfected first priority security interest and Lien in any of the Collateral purported to be covered thereby, or the Borrower shall so state in writing, or the Borrower shall in any way challenge, or shall bring any proceeding which shall in any way challenge, the prior, valid, enforceable or perfected status of such security interests or Lien or the validity or enforceability thereof;

(h)     Any authorization, approval, consent or legislation necessary for the Borrower to execute, make, deliver and perform its or his Obligations hereunder, under the Note, the Security Agreement or under any other Loan Document, is modified, revoked or terminated or otherwise does not remain in full force and effect, or for any other reason it is or becomes unlawful for the Borrower to execute, make, deliver and perform any or all of its or his Obligations hereunder, under the Note, or under any other Loan Document;

(i)     An "Event of Default" shall have occurred under the Security Agreement or any other Loan Document;

(j)     Any other Loan Document (other than this Agreement and the Security Agreement) shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and void, or the validity or enforceability thereof shall be contested by the Borrower, or the Borrower shall deny it has any further liability or obligation under, or shall fail to perform any of its or his obligations under, such Loan Documents;

(k)     A Material Adverse Effect shall have occurred;

(l)     The Borrower's voluntary bankruptcy petition (the "Bankruptcy Case") with the Bankruptcy Court is either dismissed or converted to Chapter 7 of the Bankruptcy Code;

(m)     A trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

(n)     Any plan of reorganization of the Borrower is confirmed which does not provide for the payment in full of the Obligations upon the effective date of the plan, unless otherwise agreed by the Lender in its sole and absolute discretion;

(o)     The Proposed Interim DIP Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall, in the sole opinion of the Lender, materially and adversely affect the rights of the Lender hereunder or shall materially and adversely affect the priority of any or all of the Lender's claims, liens or security interests; or

(p)     Non-compliance or default by the Borrower with any of the terms and provisions of the Proposed Interim DIP Order.

15.     Upon the occurrence of an Event of Default and the giving of three (3) days prior written notice thereof (the "Default Notice") by ATD to the Debtor's and any committee's respective counsel and the Office of the United States Trustee (the "Noticed Parties"), or upon the occurrence of the Expiration Date (as such term is defined below):

(a)     ATD shall have no further obligation to make available any financial accommodations to the Debtor;

(b)    ATD shall have the right, free of the restrictions of Bankruptcy Code § 362 or under any other section of the Bankruptcy Code or applicable law or rule, to take immediate reasonable action to protect the Collateral;

(c)    the Debtor shall immediately segregate all of the Collateral, including without limitation cash collateral, and shall not be permitted to use such Collateral absent subsequent prior written consent of ATD;

(d)    with respect to the Events of Default other than those specified in subparagraphs "(a)" through "(f)" of the preceding paragraph of this Order, the Noticed Parties shall have five (5) business days from the receipt of the Default Notice (the "Remedy Notice Period") to cure the default (if curable) or obtain an order of the Court on notice to ATD enjoining or restraining ATD from exercising its rights and remedies based upon the Event of Default specified in the Default Notice ("Restraint on Remedies"), provided that the sole grounds on which any of the Noticed Parties may seek a Restraint on Remedies shall be to allege either non-occurrence or timely cure of the Event of Default specified in the Default Notice;

(e)    payment of any and all Obligations of the Debtor to ATD arising out of or incurred pursuant to the DIP Documents shall be due and payable, and ATD shall have the right, free of the restrictions of Bankruptcy Code § 362 or under any other section of the Bankruptcy Code or applicable law or rule, to exercise its rights and remedies pursuant to the DIP Documents and/or applicable law as to all or such part of the

13

Collateral as ATD, in its sole discretion, shall elect: (1) with respect to the Events of Default specified in subparagraphs "(a)" through "(f)" of the preceding paragraph of this Order, immediately upon the giving of the Default Notice; or (2) with respect to Events of Default other than those specified in subparagraphs "(a)" through "(f)" of the preceding paragraph of this Order, immediately upon expiration of the Remedy Notice Period unless a Restraint on Remedies has timely been obtained from the Court; or (3) upon the occurrence of the Expiration Date, immediately.

16.    The Debtor shall provide ATD with such written reports or financial or other information which may be reasonably requested by the ATD.

17.    The Debtor is directed to keep its books and records of original entry, including without limitation, records of sale, credits authorized (whether or not credit memoranda have been issued), purchases, accounts receivable, bills of lading, cash receipts, and cash disbursements, current and updated, so that all business activity is posted to them promptly.

18.    ATD shall have the right, upon twenty-four (24) hours telephone or facsimile transmitted written notice to the Debtor, at any time during the Debtor's normal business hours, to inspect, audit, examine, check, make copies of or extracts from the books, accounts, checks, orders, invoices, bills of lading, correspondence and other records of the Debtor, and to inspect, audit and monitor all or any part of the Collateral, and the Debtor shall make all of same available to ATD and its representatives, for such purposes.

19.    The Debtor and any successor to the Debtor, including without limitation any successor trustee or trustees, shall (a) assign or direct to ATD any and all

14

payments, proceeds or other consideration ("Proceeds") realized upon the sale, liquidation, collection or disposition of the Collateral, including without limitation the proceeds of sales authorized pursuant to Bankruptcy Code § 363 or any plan of reorganization (a "Disposition"), and (b) immediately deliver any and all Proceeds which come into their possession to ATD in the form received.

20.     Pursuant to the provisions of Bankruptcy Code § 364(e), the liens and security interests granted under or ratified by this Order, and pursuant to Bankruptcy Code § 363(m), the validity of ATD's finance of the Post-Petition Receivables, shall be binding on the Debtor or any successor trustee even if this Order is vacated, reversed or modified on appeal.

21.     The Debtor is hereby authorized and directed to do and perform all acts and to make, execute and deliver all instruments and documents which may be required or necessary for the performance of the DIP Documents including, without limitation, the delivery to ATD of the original checks or other forms of remittance received by the Debtor which are ATD's property and/or Proceeds, and the payment by the Debtor of any monies or assets in its possession of all sums required to be paid to ATD under the DIP Documents.

22.     Nothing in this Order shall preclude the Court from entering a final order containing provisions inconsistent with or contrary to the provisions of this Order; provided, however, that ATD shall be entitled to (a) the benefits and protections of this Order, including the protections afforded pursuant to Bankruptcy Code §§ 363(m) and 364(e), with respect to all purchases of Purchased Post-Petition Receivables, advances and financial accommodations made by ATD to or for the benefit of the Debtor pursuant to this Order, and (b) discontinue the Debtor's accounts if such final order is not

15

acceptable in form and substance to ATD. Pursuant to the provisions of Bankruptcy Code §§ 363(m) and 364(e), the liens, mortgages and security interests granted under or ratified by this Order shall be binding on the Debtor or any successor trustee or trustees even if this Order is vacated, reversed or modified on appeal.

23.     The terms and conditions of this Order shall be: (a) immediately enforceable pursuant to Bankruptcy Rules 4001(a)(3) and 6004(h); and (b) not be stayed absent (1) an application by a party in interest for such stay in conformance with such Bankruptcy Rule 8005, and (2) a hearing upon notice to the Debtor and ATD.

24.     The provisions of this Order and any actions taken pursuant hereto shall survive entry of any orders which may be entered confirming any plan of reorganization or which may be entered converting this case from Chapter 11 to Chapter 7 of the Bankruptcy Code; provided, further, that the terms and provisions of this Order, as well as the liens, mortgages and security interests and the Obligations granted under this Order, shall continue in this or any superseding case under the Bankruptcy Code and such liens, mortgages and security interests and the Obligations shall maintain their priority as provided by this Order until satisfied in full.

25.     The Debtor's authorization to sell accounts and accept financial accommodations under the DIP Documents shall be in effect for the period commencing with the Petition Date through and including June 31, 2010 (the "Expiration Date") unless otherwise extended from time to time; (a) as may be agreed to, in writing, by ATD, Debtor and any committee, without further order of the Court, or (b) as may be agreed to by ATD and Debtor, and authorized by further order of the Court; including a final order authorization the continuation of the financing provided for herein or under the Line of credit Agreement.

26.     To the extent that any of the provisions of this Order shall conflict with any of the provisions of the ATD Agreement, this Order is deemed to control and shall supersede the conflicting provisions in said agreement.

27.     The hearing on the approval of the financing pursuant to the DIP ATDing Documents on a final basis is hereby scheduled for June __, 2010 at __:__ _.m. before the Court (the "Final Hearing").

28.     The Debtor shall mail copies of this Order (which shall constitute adequate notice of the Final Hearing) to parties having been given notice of the Motion, to any committee if same has been appointed (or its counsel or proposed counsel, if known) and to any other party that has filed a request for notice with the Court.

29.     Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon: (i) Ciardi Ciardi & Astin, One Commerce Square, Suite 1930, 2005 Market Street, Philadelphia, PA 19103, Attn:  Albert A. Ciardi, III, Esq., and Olshan Grundman Frome Rosenzweig & Wolosky LLP, Park Avenue Tower, 65 East 55th Street, New York, NY 10022, Attn: Andrea Fischer, Esq., proposed co-counsel for the Debtors; (ii) Wachtel & Maysr, LLP, 110 East 59th Street, New York, NY  10022, Attn: William B. Wachtel, Esq., counsel for ATD; and (iii) the Office of the United States Trustee,  Long Island Federal Courthouse, 560 Federal Plaza, Central Islip, NY 11722, in each such case that the foregoing receive the objection no later than June __, 2010 at 12:00 (noon), prevailing Eastern time.

Dated: Brooklyn, New York
          June, __, 2010

_____
UNITED STATES BANKRUPTCY JUDGE

Exhibit "B"

<p align="center"><u>CREDIT AGREEMENT</u></p>

CREDIT AGREEMENT dated as of June __, 2010, by and between ANCHOR TANK LINES CORP., a Delaware corporation (the "<u>Borrower</u>") and ANCHOR DIP LENDER LLC, a New York limited liability company (the "<u>Lender</u>").

The parties hereto agree as follows:

<p align="center"><b>SECTION I</b></p>

<p align="center"><b><u>Definitions and Accounting Terms</u></b></p>

1.1     <u>Defined Terms</u>.  As used in this Agreement, and in any certificate, document or report delivered pursuant to this Agreement, the following terms shall have the following meanings:

"<u>Affiliate</u>": as to any Person, any other Person that directly or indirectly Controls, is under common Control with, or is Controlled by, such Person and, if such Person is an individual, any member of the immediate family (including parents, spouse and children) of such individual and any trust whose principal beneficiary is such individual or one or more members of such immediate family and any Person who is Controlled by any such member or trust.

"<u>Agreement</u>":  this Credit Agreement, together with all schedules and exhibits hereto, as the same may be amended, modified, supplemented, renewed or restated from time to time.

"<u>Bankruptcy Court</u>":  the United States Bankruptcy Court for the Eastern District of New York.

"<u>Borrower</u>":  as defined in the first paragraph of this Agreement.

"<u>Borrowing Base</u>":  an amount equal to the following amount:

(a)     Up to Seventy Five Percent (75%) of Eligible Accounts Receivable, plus

(b)     One Hundred Fifty Thousand Dollars ($150,000), minus

(c)     Such reserves as the Lender in its sole and absolute discretion may deem appropriate from time to time.

"<u>Borrowing Date</u>":  one Business Day during each week as specified in a notice pursuant to <u>Section 2.3</u> hereof as the Business Day during such week that the Borrower requests the Lender to make a Loan hereunder.

"<u>Borrowing Request</u>" :  as defined in <u>Section 2.3(a)</u>.

"<u>Business Day</u>":  any day during which the Lender is open for business in New York, New York, other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

<p align="center">1</p>

"Cash Equivalents": means cash, cash equivalents and other marketable securities acceptable to the Lender in its sole discretion.

"Collateral": the collective reference to any and all properties and assets of the Borrower subject to (or purportedly subject to) a Lien granted under the Security Agreement.

"Commitment": the Lender's obligation to make Loans to the Borrower pursuant to Section 2.1 hereof in the amounts referred to therein.

"Commitment Period": the period from and including the date the Bankruptcy enters the Preliminary Interim DIP Order to, but not including, the Termination Date or such earlier date as the Commitment shall terminate as provided herein.

"Contingent Obligation": as to any Person, any obligation, contingent or otherwise, of such Person guarantying or having the economic effect of guarantying, endorsing, or otherwise being responsible for, in any manner, Indebtedness or any other liability or obligation of any other Person or any assurance with respect to the financial condition of any other Person, whether direct, indirect or contingent, including, without limitation, (a) to purchase or pay (or advance or supply funds for the purchase or payment of), or repurchase such Indebtedness or other liability or obligation, or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other liability or obligation of the payment thereof, (c) the advance or supply of funds to or the investment in any other manner in the debtor (whether through purchasing stock, making a loan, advance or capital contribution or by means of agreeing to maintain or cause such Person to maintain, a minimum working or equity capital or net worth of such Person, or otherwise), or (d) keep-well, take-or-pay, through-put or other arrangement of whatever nature having the effect of assuring or holding harmless any Person against loss with respect to any obligation of such other Person, but excluding endorsements for collection or deposit in the ordinary course of business.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking to which such Person is a party or by which it or he or any of its or his property or assets are bound.

"Controls", "Controlled by" and "under common Control with" (whether such terms shall be set forth herein in lower case or are capitalized herein) shall mean, without limitation, possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise); provided, however, that, in any event, any Person which owns directly or indirectly five percent (5%) or more of the securities having ordinary voting power for the election of directors or other governing body of a corporation or five percent (5%) or more of the partnership or other ownership interests of any other Person (other than as a limited partner of such other Person) will be deemed to control such corporation or other Person.

"Debt Interests": any bond, debenture, note or similar instrument, or other evidence of any kind or nature whatsoever of Indebtedness or obligation of any Person.

"Default": any of the events specified in Section 7.1 hereof, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Dollars" and "$": lawful currency of the United States of America.

"Eligible Accounts Receivable": accounts (as such term is defined in Section 9-102(a)(2) of the Uniform Commercial Code of the State of New York) (a) arising out of services performed by the Borrower in the ordinary course of its business and (b) which the Lender, in its exclusive discretion, and based on such considerations as the Lender may from time to time deem appropriate, considers to be an Eligible Account Receivable, but excluding any accounts having any of the following characteristics:

      (i)     That portion of accounts unpaid sixty (60) days or more after the invoice date;

      (ii)     That portion of accounts related to goods or services with respect to which Company has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reasonable reserve for warranty claims or returns;

      (iii)     That portion of accounts not yet earned by the final delivery of goods or that portion of accounts not yet earned by the final rendition of services by the Borrower to the account debtor, including with respect to both goods and services, progress billings, and that portion of Accounts for which an invoice has not been sent to the applicable account debtor;

      (iv)     Accounts owed by any unit of government, whether foreign or domestic;

      (v)     Accounts owed by an account debtor who is insolvent or is the subject of bankruptcy proceedings or who has gone out of business;

      (vi)     Accounts that are subject to any Lien in favor of any Person other than the Lender; and

      (vii)     Accounts owed by an account debtor and its affiliates, regardless of whether otherwise eligible, if fifty percent (50%) or more of the total amount of accounts due from such debtor are ineligible; or

      (viii)     Accounts, or portions of accounts, otherwise deemed ineligible by the Lender in its sole discretion.

"Equity Interests": shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other evidences of beneficial ownership of any Person, and any warrants, options or other rights to purchase or acquire any of the foregoing.

"Event of Default": any of the events specified in <u>Section 7.1</u> hereof, provided that any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"GAAP": generally accepted accounting principles in the United States of America as they are in effect from time to time.

"Government": the Government of the United States of America and its agencies and departments.

"Governmental Authority": (a) any nation or government, any state, territorial, county, municipal or other political subdivision thereof, and any entity (whether governmental, quasi-governmental or otherwise) exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, including, without limitation, the Government and (b) each other self-regulatory organization that at any time and from time to time shall have jurisdiction over, or shall be applicable to the business of, the Borrower or its Subsidiaries.

"Indebtedness": as to any Person at a particular time, all items which, in accordance with GAAP, would be included in determining total liabilities on the liability side of a balance sheet of such Person as at such time, including without limitation, (a) all indebtedness of such Person for borrowed money, including without limitation, principal, interest and fees, (b) all obligations of such Person evidenced by bonds, notes, debentures or similar instruments, (c) all obligations of such Person or any other Person secured by any Lien to which any property or asset owned or held by such Person is subject, whether or not such Person has assumed or become liable for the obligation secured thereby; (d) all obligations of such Person in respect of the deferred purchase price of property or services, (e) all obligations of such Person under conditional sales or other title retention or similar agreements; (f) all capitalized lease obligations of such Person, (g) all obligations arising under bankers' or trade acceptance facilities; (h) all obligations under the letters of credit issued for the account of such Person; (i) any other obligation of such Person treated or required to be treated as indebtedness under GAAP; and (j) all Contingent Obligations of such Person in respect of the foregoing.

"Indemnitee": as defined in <u>Section 9.2(b)</u>.

"Interest Payment Date": the first day of each calendar month during the term of this Agreement commencing on [July 1, 2010].

"Interest Rate" : as defined in <u>Section 2.6(a)</u> hereof.

"Lender": as defined in the first paragraph of this Agreement.

"Lien": any mortgage, pledge, security interest, hypothecation, assignment for security purposes, deposit arrangement, encumbrance, lien (statutory or other), purchaser option, call or similar right of any third party with respect to securities or other obligations or assets, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and

the filing of any financing statement under the Uniform Commercial Code or comparable or other law of any jurisdiction).

"Loan": any loan made pursuant to Section 2.1 hereof.

"Loan Documents": this Agreement, the Note, the Security Agreement and all reports, statements, certificates, schedules and other documents or instruments executed and delivered pursuant to or in connection with any of the foregoing, as each may be from time to time amended, modified or supplemented.

"Material Adverse Effect": means (a) a material adverse effect on the business, assets, operations, prospects or condition (financial or otherwise) of the Borrower, (b) an adverse effect on the ability of the Borrower to perform any of its obligations under this Agreement or any of the other Loan Documents, (c) an adverse effect on the rights of or benefits available to the Lender under this Agreement or any of the other Loan Documents or (d) a material adverse change in the value of the Collateral, in each case, as determined by the Lender in its sole and absolute discretion.

"Maximum Exposure": shall mean One Million One Hundred Fifty Thousand Dollars ($1,150,000).

"Note": as defined in Section 2.2 hereof.

"Obligations": all present and future Indebtedness, obligations and liabilities of any kind or nature whatsoever of the Borrower to the Lender, including, without limitation, all present and future Indebtedness, obligations and liabilities of any kind or nature whatsoever of the Borrower to the Lender under this Agreement, the Note, the Security Agreement and the other Loan Documents, in all cases, whether due or to become due, secured or unsecured, absolute or contingent, joint or several, and whether for principal, interest, fees, premiums, expenses or otherwise, together with any and all expenses which may be paid or incurred by the Lender in collecting any and all of such Indebtedness, obligations and liabilities and/or enforcing any rights of the Lender, including without limitation, under this Agreement, the Note, the Security Agreement, and the other Loan Documents.

"Permitted Liens": as defined in Section 6.2 hereof.

"Person": an individual, firm, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Proposed Motion": the proposed Motion for Interim and Final Orders (A) Authorizing Debtor to Enter Into a Secured Debtor-In-Possession Credit Agreement, (B) Granting Priority Administrative Expense Claims and Liens Secured by Property of the Estate Pursuant to Sections 363 and 364 of the Bankruptcy Code and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, a copy of which is attached hereto as Exhibit F.

"Proposed Interim DIP Order": the proposed Interim Order (A) Authorizing Debtor to Enter Into a Secured Debtor-In-Possession Credit Agreement, (B) Granting Priority

Administrative Expense Claims and Liens Secured by Property of the Estate Pursuant to Sections 363 and 364 of the Bankruptcy Code and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001, a copy of which is attached hereto as <u>Exhibit E</u>.

"<u>Receivables</u>": as defined in the Security Agreement.

"<u>Requirement of Law</u>":  as to any Person, (a) the Certificate of Incorporation, By-Laws, partnership agreement, limited liability company operating agreement, or other organizational or governing documents of such Person, (b) any federal, state or local law, statute, treaty, rule, regulation, ordinance, requirement, classification or restriction, or (c) any order, injunction, judgment, decree, ruling, interpretation, finding, directive or other determination of an arbitrator or a court or other Governmental Authority, or (d) common law or other legal precedent, and, in the case of clauses (b), (c) and (d) of this definition, applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"<u>Responsible Financial Officer</u>":  the chief financial officer of a Person or such other person to whom the Board of Directors of such Person shall delegate the duties of the chief financial officer.

"<u>Responsible Officer</u>":  the chief executive officer of a Person or such other person to whom the Board of Directors of such Person shall delegate the duties of the chief executive officer.

"<u>Security Agreement</u>":  as defined in <u>Section 3.1(g)</u> hereof.

"<u>Subsidiary</u>":  with respect to any Person, any other Person (other than an individual) of which at least a majority of the outstanding stock having ordinary voting power to elect a majority of the board of directors of such corporation (irrespective of whether, at the time, stock of any other class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time, directly or indirectly, owned by such Person and/or one or more Subsidiaries or intermediaries of such Person, or which is Controlled, directly or indirectly, by such Person.

"<u>Taxes</u>":  any and all present or future taxes, levies, assessments, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"<u>Termination Date</u>":  July 31, 2010 or, if such date is not a Business Day, the Business Day next preceding such date.

1.2     <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, modified, or supplemented (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any

reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3     Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP.

## SECTION II

## Amount and Terms of Commitment

2.1     Commitment.  Subject to the terms and conditions hereinafter set forth, the Lender agrees to make Loans to the Borrower from time to time during the Commitment Period in an aggregate principal amount not to exceed at any one time outstanding the lesser of (i) the Maximum Exposure and (ii) the Borrowing Base.  Subject to the terms and provisions of this Agreement, during the Commitment Period, the Borrower may borrow, prepay and reborrow Loans. The Lender shall have the right to establish reserves in such amounts, and with respect to such matters, as the Lender shall deem necessary or appropriate, against the amount of Loans that the Borrower may otherwise request under this Agreement, including, without limitation, in respect of such events, conditions or contingencies which the Lender, in its sole credit judgment, determines at any time and from time to time.  The Lender shall use its commercially reasonable efforts to provide the Borrower with prior written notice of its intention to establish, or increase existing, reserves, provided, however, that the failure of the Lender to do so shall not constitute a breach of this Agreement by the Lender nor affect the validity or enforceability of the reserve so established or increased, as the case may be.

2.2     Note.  The Loans made by the Lender pursuant hereto shall be evidenced by a promissory note of the Borrower, substantially in the form of Exhibit A hereto, with appropriate insertions therein as to date and principal amount (the "Note"), payable to the order of the Lender and representing the obligation of the Borrower to pay the aggregate unpaid principal amount of all Loans made by the Lender, in each case with interest thereon as prescribed hereunder.  The Lender is hereby authorized to record the date and amount of each Loan made by the Lender, and the date and amount of each payment or prepayment of principal thereof on the schedule annexed to and constituting a part of the Note and any such recordation shall constitute conclusive evidence of the accuracy of the information so recorded in the absence of manifest error.  The Note shall bear interest for the period from the date thereof on the unpaid principal amount thereof from time to time outstanding at the applicable interest rate per annum determined as provided hereunder.

2.3     Making the Loans.

(a)     The Borrower shall make each request for a borrowing hereunder.  Each borrowing shall be made on prior irrevocable telephonic notice (or in such other manner of notice reasonably requested by the Lender) no later 1:00 P.M. (New York City time) on the requested Borrowing Date, specifying (i) the date of such requested borrowing (which shall be a Business Day), (ii) the number and location of the account in New York City to which funds are to be disbursed, (iii) the amount of such requested Borrowing and (iv) such other information as the Lender may at any time and from time to time reasonably request.  Each such notice shall be confirmed by the Borrower in writing by e-mail, facsimile transmission or by hand delivery no later than the next Business Day.  Such confirmation may take the form of a Borrowing Request, a form of which is attached hereto as Exhibit B (a "Borrowing Request").  Upon fulfillment by the Borrower of the applicable conditions precedent set forth in Section III, the Lender shall make the requested Loan by wire transfer of immediately available or next day funds to such account in New York City as the Borrower may designate in the applicable Borrowing Request.

(b)     As an accommodation to the Borrower, the Lender may permit telephonic requests for Loans and electronic transmittal of instructions, authorizations, agreements or reports to the Lender by the Borrower.  Unless the Borrower specifically directs the Lender in writing not to accept or act upon telephonic or electronic communications from the Borrower, the Lender shall have no liability to the Borrower for any loss or damage suffered by the Borrower as a result of the Lender's honoring of any requests, execution of any instructions, authorizations or agreements or reliance on any reports communicated to it telephonically or electronically and purporting to have been sent to the Lender by the Borrower and the Lender shall have no duty to verify the origin of any such communication or the authority of the Person sending it.

2.4     Termination of Commitment.     The Commitment shall terminate on the Termination Date.  However, the Borrower shall have the right, upon not less than ten (10) Business Days' notice to the Lender, to permanently terminate the Commitment.  Any such termination of the Commitment shall be accompanied by (a) prepayment in full of the Loans then outstanding hereunder, (b) the payment of all accrued but unpaid interest thereon to the date of such prepayment and (c) the payment of any other Obligations then accrued but unpaid.

2.5     Mandatory Prepayments.  The Borrower shall, at any time and from time to time, if any, that the outstanding principal amount of the Loans exceeds the lesser of the (a) the Maximum Exposure and (b) the Borrowing Base, immediately prepay the Loans in the amount of such excess, together with accrued interest on the amount prepaid.

2.6     Interest Rates and Interest Payment Dates.

(a)     Loans shall bear interest for the period from and including the date thereof until maturity on the unpaid principal amount thereof at a rate per annum equal to Twenty Four Percent (24%) (the "Interest Rate").

(b)     Notwithstanding Section 2.6(a), after the occurrence and during the continuance of any Event of Default, the Borrower agrees to pay interest on the outstanding principal amount of the Loan at the a rate equal to the Interest Rate plus Five Percent (5%), compounded monthly on each Interest Payment Date.

(c) Interest on Loans shall be payable in arrears on each Interest Payment Date and at maturity (whether at stated maturity, by acceleration or otherwise).

(d) For interest calculation purposes, all items of payment received by the Lender shall be considered applied by the Lender against the Obligations on the third Business Day after receipt and collection by the Lender in immediately available funds of such items.

2.7    Computation of Interest.  Interest in respect of Loans shall be calculated on the basis of a 360 day year for the actual number of days elapsed.

2.8    Payments.  All payments (including prepayments) to be made by the Borrower on account of principal, interest, fees and all other amounts due to the Lender hereunder and under the other Loan Documents shall be made without set-off or counterclaim and shall be made to the Lender at the Lender's office located at _____, in Dollars and in immediately available funds by 1:00 P.M. (New York City time) on the date payment is due.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

2.9    Maximum Interest Rate.  It is the intention of the Lender and the Borrower that interest (as defined under any Requirement of Law) on the Loans made pursuant to the Loan Documents that may be charged to, collected from or received from the Borrower shall not exceed the maximum rate permissible under law.  Accordingly, anything herein or in the Loan Documents to the contrary notwithstanding, in the event any interest is charged to, collected from or received from the Borrower by the Lender pursuant hereto or thereto in excess of such maximum lawful rate, then the excess of such payment over that maximum shall be applied to the reduction of the outstanding principal balance of the Loans and the other Obligations, and any portion of such excess payment remaining after payment and satisfaction in full of such Loans and such other Obligations and termination of the Commitment shall be returned by the Lender to the Borrower.

## SECTION III

## Conditions of Lending

3.1    Conditions Precedent to the Initial Loan.  The obligation of the Lender to make the initial Loan hereunder is subject to the condition precedent that the Lender shall have received the following in form and substance satisfactory to the Lender:

(a) Note.  The Note duly executed by a duly authorized officer of the Borrower.

(b) Evidence of Corporate Action.  Certified copies of the resolutions of the Board of Directors of the Borrower approving this Agreement, the Note, the Security Agreement, and the other Loan Documents executed, delivered and to be performed by the Borrower.

(c) Good Standing Certificates.  Good standing certificates of the Borrower from the Secretary of State of its jurisdictions of incorporation and from each other state in

which it is qualified to do business as a foreign entity and a certificate or other evidence of good standing as to the payment of any applicable franchise or similar taxes from the appropriate taxing authority of each such jurisdiction, in each case dated a recent date.

(d)    Certified Governing Documents.  A certified copy of the certificate of incorporation, as amended to date, of the Borrower from the Secretary of State of Delaware and a copy of the by-laws, as amended to date, certified by a Responsible Officer of the Borrower.

(e)    Incumbency Certificates.  Certificates of the Secretary or an Assistant Secretary of the Borrower certifying the names and true signatures and incumbency of the officers of the Borrower authorized to sign this Agreement, the Note, the Security Agreement, and the other Loan Documents.

(f)    Proposed Interim DIP Order.  The Bankruptcy Court shall have entered the Proposed Interim DIP Order in form and substance acceptable to the Lender in its sole and absolute discretion and it shall not have been reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall, in the sole and absolute discretion of the Lender, materially and adversely affects the rights of the Lender hereunder or under any other Loan Document or shall materially and adversely affect the priority of any or all of the Lender's claims, liens or security interests.

(g)    Security Agreement.

(i)    Security Agreement (as the same may be amended, modified, supplemented, renewed or restated from time to time, the "Security Agreement"), duly executed by the Borrower, together with: (A) acknowledgment copies of Uniform Commercial Code Financing Statements (Forms UCC-1) duly filed under the Uniform Commercial Code of all jurisdictions as may be necessary or, in the opinion of the Lender and its counsel, desirable in order to perfect the Liens created by the Security Agreement; and (B) evidence that all other actions necessary or, in the opinion of the Lender and its counsel, desirable to create a valid, enforceable and perfected first priority Lien in the Collateral covered by this Agreement and the other Loan Documents and to protect the Lien and security interest created by the Security Agreement have been taken.

(ii)    The results of a recent search of all effective Uniform Commercial Code financing statements, fixture filings, judgment and tax Lien filings in respect of the property and assets of the Borrower, and pending litigation and bankruptcy searches with respect to the Borrower, together with copies of all such filings, and Uniform Commercial Code termination statements and other similar statements, documents and instruments for filing in each jurisdiction as may be necessary to terminate any effective Uniform Commercial Code and other filings disclosed on the foregoing searches or otherwise on record with regard to the Collateral.

(h)    No Default.  A certificate of the chief executive officer of the Borrower to the effect that no event has occurred and is continuing, or would result from the initial Loan, which constitutes a Default or an Event of Default.

(i)     Additional Matters.  Such other documents and such other action as may be requested by the Lender in connection with the transactions contemplated by this Agreement.

3.2     Conditions Precedent to All Loans.

(a)     The obligation of the Lender to make each Loan (including the initial Loan) shall be subject to the conditions precedent that on the date of each such Loan:

(i)     The following statements shall be true, complete and correct and the Borrower, if requested by the Lender, shall have delivered to the Lender a certificate of the Borrower signed by a Responsible Officer of the Borrower dated the date of each such Loan stating that: (i) the representations and warranties contained in this Agreement, in the Security Agreement and in all other Loan Documents are true, complete and correct on and as of the date of each such Loan as though made on and as of such date (except to the extent such representations and warranties expressly relate to an earlier time or date, in which case they shall have been true and correct as of such earlier time or date); and (ii) no event has occurred and is continuing, or would result from such Loan which constitutes a Default or an Event of Default; and

(ii)     All other conditions in the Loan Documents to the obligation of the Lender to make such Loan have been satisfied.

(b)     Each borrowing hereunder shall constitute a representation and warranty by the Borrower hereunder as of the date of such borrowing that the conditions in this Section 3.2 have been satisfied.

## SECTION IV

## Representations and Warranties

The Borrower represents and warrants to the Lender as follows:

4.1     Capital Structure.  Exhibit D hereto sets forth a true and complete list of the owners of all of the issued and outstanding Equity Interests and Debt Interests in the Borrower and its Subsidiaries.  All of the foregoing Equity Interests and Debt Interests have been duly and validly issued, are fully paid and non-assessable, and are owned free and clear of any Lien.  Except as set forth on Exhibit D, the Borrower does not have any Subsidiaries or Affiliates.

4.2     Good Standing and Qualification; Compliance with Law.  Each of the Borrower and its Subsidiaries (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has all requisite corporate power and authority to own or lease and operate its properties and to conduct its business as now being conducted, (c) is duly qualified and in good standing as a foreign entity, and is authorized to do business under the laws of each jurisdiction where the failure to be so qualified and in good standing could cause a Material Adverse Effect; and (d) is in compliance all Requirements of Law.

4.3     Corporate Power and Authority.  The Borrower has full power and authority to execute, make and deliver this Agreement, the Note, its Security Agreement, and the other Loan

Documents to which it is a party, all of which has been duly authorized by all necessary and proper corporate and other action, as applicable, and to incur and perform its Obligations hereunder and thereunder. Except in connection with filings in respect of the Borrower to record or perfect the Liens granted to the Lender in the Collateral and, except as set forth on Schedule 4.3, no consent, authorization or approval or other action by, and no notice or filing with, any Governmental Authority or other Person, or the taking of any other action, is required as a condition to the borrowings hereunder or in connection with the execution, delivery, performance, validity or enforceability of this Agreement, the Note, the Security Agreement, or any other Loan Document.

4.4     Binding Agreements.  This Agreement, the Note, the Security Agreement and the other Loan Documents constitute the valid and legally binding obligations of the Borrower and the other Loan Parties, as the case may be, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium and similar laws affecting creditors' rights generally.

4.5     Litigation.  Except as set forth on Schedule 4.5 hereto, no actions, suits, claims, investigations or administrative proceedings of or before any court, arbitrator, commission, board, bureau, agency or Governmental Authority are pending, or, to the best knowledge of the Borrower, threatened, against the Borrower or any of its properties or assets.

4.6     No Conflicting Law or Agreements.  The execution, delivery and performance by the Loan Parties of this Agreement, the Note, the Security Agreement and the other Loan Documents to which they are parties do not and will not (i) violate or conflict with any Requirement of Law; (ii) violate or conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any agreement, plan, mortgage, indenture, instrument or other Contractual Obligation of the Borrower, except for such violations and conflicts which could not, individually or in the aggregate, have a Material Adverse Effect; or (iii) result in or require the creation or imposition of any Lien upon any property or assets of the Borrower except as contemplated by this Agreement and the other Loan Documents.

4.7     Ownership of Property; Lien.  The Borrower and its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all its real property and personal property, and good title to all their other property, and none of such property is subject to any Lien except as for Permitted Liens.

4.8     Certain Licenses and Intellectual Property.  Each franchise, license, certificate, authorization, approval and consent from any Governmental Authority and each other Person reasonably necessary to the present and presently intended conduct of the Borrower's and its Subsidiaries' business and operations, or required for the acquisition, ownership, improvement, operation or maintenance by them of any assets or properties they now own, operate or maintain, has been obtained and validly granted and is in full force and effect.  The Borrower and its Subsidiaries own or are licensed to use all trademarks, trade names, copyrights and all other proprietary rights and intellectual property reasonably necessary to the present conduct of the its business and operations.  No action, suit or proceeding is pending or, to the Borrower's knowledge, threatened, challenging or questioning the use of any trademarks, trade names, copyrights and all other proprietary rights and intellectual property, nor does the Borrower know

12

of any valid basis for any such claim, which, in either case, could have a Material Adverse Effect. The use of the trademarks, trade names, copyrights and all other proprietary rights and intellectual property does not infringe on the rights of any Person.

4.9     No Default. None of the Borrower or any of its Subsidiaries is in default under or with respect to any of its Contractual Obligations which could result in a Material Adverse Effect.

4.10     Use of Proceeds. The proceeds of the loans hereunder shall be used by the Borrower for general working capital requirements.

## SECTION V

## Affirmative Covenants

Until payment in full of the Note and the payment and performance of all other Obligations, or as long as the Lender shall have any Commitment hereunder, the Borrower will:

5.1     Certificates; Other Information. Furnish, or cause to be furnished, to the Lender:

(a)     on or prior to Wednesday of each week, a compliance certificate of the Borrower in the form attached hereto as Exhibit C signed by the Borrower's Responsible Financial Officer;

(b)     within 15 days after the end of each month, a schedule of its accounts receivable as at the end of such month, indicating, among other things from time to time requested by the Lender, the name of the debtor of each account receivable, the aggregate amount thereof and a schedule aging all accounts receivable, in form and substance satisfactory to the Lender, and such accounts payable agings, inventory schedules and agings and such other schedules and agings requested by the Lender, each in form and substance satisfactory to the Lender; and

(c)     within 30 days of filing, copies of all federal, state, local and foreign tax returns of the Borrower; and

(d)     promptly upon request, such other information respecting the condition or operations, financial or otherwise, of the Borrower as the Lender shall request.

5.2     Conduct of Business and Maintenance of Existence. Continue, and cause each of its Subsidiaries to continue, to engage in business of the same general type as now conducted by it; preserve, renew and keep in full force and effect its corporate existence, rights, privileges and franchises in good standing in the jurisdiction of incorporation and qualify and remain qualified, as a foreign corporation in each jurisdiction in which such qualification is necessary in view of its businesses and operations or the ownership of its properties and assets, and comply with all Contractual Obligations, in each case, except for failures to so comply which, individually or in the aggregate, could not have a Material Adverse Effect; and comply with all Requirements of Law.

5.3     Maintenance of Property, Insurance.  Maintain, and cause each of its Subsidiaries to maintain, in good working order and condition, ordinary wear and tear excepted, all property and assets which, in the Borrower's good faith judgment, is useful and reasonably necessary to its business and operations; make, and cause each of its Subsidiaries to make, all needed and proper repairs, renewals, replacements, additions and improvements thereto and take such steps as are reasonably necessary to maintain, preserve and protect all rights with respect to all trademarks, trade names, copyrights and other proprietary rights and intellectual property necessary for the conduct of its and its Subsidiaries respective business and operations; maintain, and cause each of its Subsidiaries to maintain, with financially sound and reputable insurance companies insurance covering such properties and assets, against such risks, in such amounts acceptable to the Lender and on terms and conditions reasonably acceptable to the Lender, name the Lender an additional insured and loss payee on all such insurance policies (which insurance policies shall provide for not less than 30 days prior written notice to the Lender of any alteration, modification or cancellation of any and all such policies); furnish to the Lender copies of all insurance policies and certificates of insurance, including renewals thereof, required to be maintained by this Section 5.3.

5.4     Inspection of Property.  Keep, and cause each of its Subsidiaries to keep, proper books and records in which true, complete and correct entries in conformity with GAAP and in all respects with all Requirements of Law shall be made of all dealings and transactions in relation to its business and activities; and, the Lender shall have the right, upon twenty four (24) hours telephone or facsimile transmitted written notice to the Borrower, at any time during the Borrower's normal business hours, to inspect audit, examine, check, make copies of or extracts from the books, accounts, checks, orders, invoices, bills of lading, correspondence and other records of the Borrower, and to inspect, audit and monitor all or any part of the Collateral, and the Borrower shall make all of the same available to the Lender and its representatives for such purposes.

5.5     Notices.  Within three (3) Business Days, thereof, give notice to the Lender:

(a)     of the occurrence of any Default or Event of Default;

(b)     of any (i) default or event of default under any Contractual Obligation of the Borrower the occurrence of which could result in a Material Adverse Effect, and (ii) any litigation or investigation of which either Borrower has knowledge, or proceeding which may exist, at any time between the Borrower and any Governmental Authority;

(c)     of the commencement of all actions, proceedings and investigations by or before any Governmental Authority or other body, or in any court or before any arbitrator, to which the Borrower is a party, or in any way relating to the Borrower or any of its properties and assets, where the amount involved could exceed $50,000 in any single instance or in the aggregate, or, without regard to such amount, which could result in a Material Adverse Effect, or in which injunctive or similar relief is sought; and

(d)     of any other matter, item or event that results in, or could result in, a Material Adverse Effect.

Each notice pursuant to this Section 5.6 shall be accompanied by a statement of the Responsible Officer of the Borrower setting forth all details of the occurrence referred to therein and stating what action such Person proposes to take or cause to be taken with respect thereto.

5.6     Payment of Taxes.  Pay and discharge, and cause each of its Subsidiaries to pay and discharge, all Taxes imposed upon it or any of its Subsidiaries, and any of its properties and assets as and when they become due and payable; provided, however, that no such Tax need be paid if it is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, if such reserves or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor and if no Lien in respect of such Tax has been asserted, filed, or imposed on any of the respective properties or assets of the Borrower or any such Subsidiaries or other Loan Parties, as the case may be.

5.7     Payment of Debts, Etc.  Pay, discharge and perform, and cause each of its Subsidiaries to pay, discharge and perform, all debts and obligations (other than Taxes) promptly and in accordance with the terms thereof before the same shall become in default, as well as other lawful claims, which, if unpaid, might become a Lien or charge upon its properties or assets; provided, however, that no such debts or obligations need be paid if it is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted, if reserves or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor and if no Lien in respect of such debts or obligations has been asserted, filed, or imposed on any of the respective properties or assets of the Borrower or any such Subsidiaries or other Loan Parties, as the case may be.

## SECTION VI

## Negative Covenants

Until payment in full of the Note and the payment and performance of all other Obligations, or as long as the Lender shall have any Commitment hereunder, no Borrower will, and no Borrower will permit any of its Subsidiaries to:

6.1     Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness evidenced by the Note; and

(b)     trade payables and operating expenses incurred in the ordinary course of its business in amounts and on terms consistent with past practice.

6.2     Limitation on Liens.  Create, incur, assume or suffer to exist any Lien upon any of its properties, assets or revenues, whether now owned or hereafter acquired, except the following (collectively, "Permitted Liens"):

(a)     Liens in favor of the Lender in respect of the Collateral;

(b)     Liens for Taxes not yet due;

(c)　　Liens of lessors, carriers, warehousemen, vendors, mechanics, laborers, repairmen and materialmen incurred in the ordinary course of business for sums not yet due;

(d)　　Deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security;

(e)　　Deposits made to secure liability to insurance carriers under self-insurance arrangements in effect on the date hereof; and

(f)　　Liens listed on <u>Schedule 6.2</u>.

6.3　　<u>Limitation on Fundamental Changes.</u>　Enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve (or suffer any liquidation or dissolution), convey, sell, lease, transfer or otherwise dispose of, in one transaction or a series of transactions, all or a substantial part of its business or assets, or acquire by purchase or otherwise all or substantially all the business or assets of, or Equity Interests or Debt Interests of, any Person or make any change in the present method of conducting business.

6.4　　<u>Prohibition on Disposition of Assets</u>.　Sell, lease, assign, transfer or otherwise dispose of any properties or assets, whether now owned or hereafter acquired, including, without limitation, the Collateral, except obsolete, worn out property, or inventory disposed of in the ordinary course of business.

6.5　　<u>Sale and Leaseback</u>.　Become or remain liable as lessee or as a guarantor or other surety with respect to any lease, whether an operating Lease or a capital lease, of any property (whether real, personal or mixed), whether now owned or hereafter acquired, (a) which the Borrower or any of its Subsidiaries has sold or transferred or is to sell or transfer to any other Person, or (b) which the Borrower or any of its Subsidiaries intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by the Borrower or any of its Subsidiaries to any Person in connection with such lease.

6.6　　<u>Loan, Advances, Investments</u>.　Make any loan, advance or capital contribution or extend any credit to any Person, or purchase or otherwise acquire, hold or invest in, or make any commitment to purchase or otherwise acquire, hold or invest in, any Equity Interest or Debt Interest of any Person except the Borrower and its Subsidiaries may invest in Cash Equivalents that are subject to the Lien of the Lender pursuant to the Loan Documents.

6.7　　<u>Prepayment of Indebtedness.</u>　Prepay or acquire prior to stated maturity any Indebtedness other than prepayment of Indebtedness evidenced by the Note (to the extent permitted herein and thereunder).

6.8　　<u>Dividends</u>.　Declare any dividend or distribution (whether in cash, securities, property or other obligations) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, retirement or other acquisition of any Equity Interests of the Borrower or any of its Subsidiaries, whether now or hereafter outstanding; except:

(a)     any payment, dividend or distribution in an amount necessary to allow a holder of Equity Interests of the Borrower or any such Subsidiary to pay (after taking into account all available deductions (including, without limitation, deductions for the payment of state and local income taxes in calculating federal income tax liabilities), deferrals, credits, and other reductions of Taxes) all applicable income taxes due and payable by such holder and attributable to such holder solely in its or his capacity as a holder of such Equity Interests; and

(b)     the Subsidiaries of the Borrower may pay, make or set apart any sum or property for, any payment or other distribution or dividend to the Borrower.

6.9     <u>Character of Business</u>.  Cause, suffer to exist or otherwise permit any change in the general character of the business of the Borrower or Subsidiaries as conducted on the date of this Agreement.

6.10     <u>Transactions with Affiliates</u>.  Enter into any transaction (including, without limitation, the lease, purchase, sale or exchange of any asset or property, the making of any advance or loan or the entering into of any agreement or arrangement for any payment in respect of any fee, charge or other expense for services performed or to be performed or any allocation of administrative salaries, expenses and other general overhead), directly or indirectly, and will not permit any of its Subsidiaries to enter into any transaction, with any Affiliate other than (a) in the ordinary course of business, (b) pursuant to the reasonable requirements of the business of the Borrower and (c) upon terms and provisions which are fully disclosed to the Lender, are fair and reasonable and are no less favorable to the Borrower than it could have obtained in a comparable arm's-length transaction with a Person who is not an Affiliate of the Borrower.

## SECTION VII

## Events Of Default

7.1     <u>Events of Default</u>.  If any of the following events ("<u>Events of Default</u>") shall occur and be continuing:

(a)     The Borrower shall fail to pay any (i) principal in respect of any Loan when due (whether upon acceleration, at stated maturity, by mandatory prepayment or otherwise), or (ii) (A) any interest in respect of any Loan, or (B) any other Obligations, in each case when due (whether upon acceleration, at stated maturity, by mandatory prepayment or otherwise) and such failure shall continue for a period of 5 days;

(b)     Any representation or warranty made under or in connection with this Agreement, the Note, the Security Agreement, or in any other Loan Document shall prove to have been incorrect when made or deemed made;

(c)     The Borrower shall fail to perform or observe any covenant, agreement or obligation under <u>Sections 2.5</u>, <u>2.6</u> and <u>VI</u> hereof;

(d)     Except as provided in <u>Sections 7.1(a)</u>, <u>(b)</u> and <u>(c)</u> hereof, the Borrower shall fail to perform or observe any other covenant, agreement or obligation contained in this

Agreement, the Note, the Security Agreement or any other Loan Document on its parts to be performed or observed and such failure shall remain unremedied for a period of thirty (30) days;

(e)     The Borrower or any of its Subsidiaries shall fail to pay any Indebtedness in excess of $100,000, or any interest, fees, charges or premiums thereon, when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) or any other default under any agreement or instrument relating to any such Indebtedness, or any event shall occur, in each case if the effect of such failure, default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness, or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), prior to the stated maturity thereof;

(f)     Any judgment or judgments shall be rendered against the Borrower in excess of $100,000 in any single instance or in the aggregate and (i) the amount of any such judgment or judgments, or portions thereof, not covered by insurance shall be in excess of $10,000 or (ii) any such judgment or judgments shall remain unpaid, unstayed on appeal, undischarged, unbonded or undismissed for a period of 30 days or more;

(g)     The Security Agreement shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and void, or shall cease to create a valid, enforceable and perfected first priority security interest and Lien in any of the Collateral purported to be covered thereby, or the Borrower shall so state in writing, or the Borrower shall in any way challenge, or shall bring any proceeding which shall in any way challenge, the prior, valid, enforceable or perfected status of such security interests or Lien or the validity or enforceability thereof;

(h)     Any authorization, approval, consent or legislation necessary for the Borrower to execute, make, deliver and perform its or his Obligations hereunder, under the Note, the Security Agreement or under any other Loan Document, is modified, revoked or terminated or otherwise does not remain in full force and effect, or for any other reason it is or becomes unlawful for the Borrower to execute, make, deliver and perform any or all of its or his Obligations hereunder, under the Note, or under any other Loan Document;

(i)     An "Event of Default" shall have occurred under the Security Agreement or any other Loan Document;

(j)     Any other Loan Document (other than this Agreement and the Security Agreement) shall, for any reason, cease to be in full force and effect, or shall be declared, in whole or in part, null and void, or the validity or enforceability thereof shall be contested by the Borrower, or the Borrower shall deny it has any further liability or obligation under, or shall fail to perform any of its or his obligations under, such Loan Documents;

(k)     A Material Adverse Effect shall have occurred;

(l)     The Borrower's voluntary bankruptcy petition (the "Bankruptcy Case") with the Bankruptcy Court is either dismissed or converted to Chapter 7 of the Bankruptcy Code;

(m)     A trustee or an examiner with expanded powers is appointed in the Bankruptcy Case;

(n)     Any plan of reorganization of the Borrower is confirmed which does not provide for the payment in full of the Obligations upon the effective date of the plan, unless otherwise agreed by the Lender in its sole and absolute discretion;

(o)     The Proposed Interim DIP Order is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall, in the sole opinion of the Lender, materially and adversely affect the rights of the Lender hereunder or shall materially and adversely affect the priority of any or all of the Lender's claims, liens or security interests; or

(p)     Non-compliance or default by the Borrower with any of the terms and provisions of the Proposed Interim DIP Order.

then, and in any such event, the Lender may (i) declare its obligation to make Loans to be terminated, whereupon the same shall forthwith terminate and (ii) declare the Note, all interest thereon and all other amounts and Obligations payable under this Agreement and all other Loan Documents to be forthwith due and payable, whereupon the Note, all such interest and all such amounts and Obligations shall become and be forthwith due and payable, without presentment, demand, protest, notice of protest, or other notice of any kind, or any other action by any other Person, all of which are hereby expressly waived by the Borrower; provided, however, that upon the occurrence of any event described in Section 7.1(i), the Commitment shall automatically terminate and the Note, all interest thereon and all other amounts and Obligations payable under this Agreement and all other Loan Documents to be forthwith due and payable, without presentment, demand, protest, notice of protest, or notice of any kind, or any other action by any other Person, all of which are hereby expressly waived by the Borrower. No failure on the part of the Lender to exercise, and no delay in exercising, any right hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Lender of any right hereunder preclude other or further exercise thereof or the exercise of any other right. The remedies provided herein are cumulative and not exclusive of any remedies provided by law or any other agreement or instrument executed or delivered pursuant hereto or thereto.

## SECTION VIII

### Miscellaneous

8.1     Amendments and Waivers.  None of this Agreement, the Note, the Security Agreement, any other Loan Document, nor any term, covenant or condition hereof or thereof (a) may be changed, discharged, modified or terminated except by a writing executed by the Lender and the Borrower and (b) may be waived except by a writing executed by the party granting such a waiver.  No failure on the part of the Lender to exercise, and no delay in exercising, any right, remedy or power hereunder, or under the Note, the Security Agreement, or any other Loan Document shall preclude any other or future exercise thereof, or the exercise of any other right, remedy or power.  No waiver of any term, covenant or condition hereof or under the Note, the Security Agreement or any other Loan Document shall be deemed a waiver of future

performance of or compliance with the same term, covenant or condition or a waiver of any other term, covenant or condition.

8.2    Indemnity.

(a)    The Lender and its designees, and its directors, officers, employees and agents, shall not incur any liability (other than for a Person's own acts or omissions amounting to gross negligence or willful misconduct) arising out of or related directly or indirectly to this Agreement or any other Loan Document or the transactions contemplated hereby and thereby and the Borrower hereby expressly waive any and all claims and actions (other than those attributable to a Person's own acts or omissions amounting to gross negligence or willful misconduct) against, and jointly and severally agree to indemnify, defend and hold harmless, the Lender and its Affiliates, directors, officers, employees, advisors and agents (collectively, the "Indemnitees"), from and against any and all losses, claims, damages, expenses and liabilities (including, without limitation, reasonable attorneys' fees and disbursements) arising out of or related directly or indirectly to any and all of the foregoing.

(b)    To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any of the Indemnitees, for special, indirect, consequential, incidental or punitive damages arising out of, or related directly or indirectly to, this Agreement, the other Loan Documents, or the transactions contemplated hereby and thereby.

8.3    Applications.  Any funds received from or on behalf of the Borrower (whether pursuant to any of the terms and provisions of this Agreement or otherwise) by the Lender shall be applied in such manner and order as the Lender may determine in its sole and absolute discretion to, among other items, the following:

(a)    the payment to or reimbursement of the Lender for any expenses for which it is entitled to be paid or reimbursed pursuant to any of the provisions of this Agreement end any other Loan Document;

(b)    the payment in full of all other Obligations (except as provided in Sections 8.3(c) and (d) below) under this Agreement and the other Loan Documents;

(c)    the payment of accrued and unpaid interest on the Note; and

(d)    the payment of the outstanding principal when due (whether at stated maturity, by acceleration or otherwise) on Loans made hereunder.

8.4    Expenses.  The Borrower agrees to pay Twenty Thousand Dollars ($20,000.00) to reimburse the Lender for the costs and expenses of the Lender incurred in connection with the preparation, execution and delivery of the Lender's Commitment, this Agreement and all other Loan Documents and related documents, instruments and agreements (whether or not the transactions contemplated by this Agreement shall be consummated).  In addition, the Borrower agrees to promptly reimburse the Lender for all costs and expenses (including court costs and reasonable fees and expenses of the attorneys for the Lender) incidental to the administration, maintenance, enforcement and adjudication of this Agreement, the Note, the Security Agreement, all other Loan Documents, and all related documents, instruments and agreements

executed in connection herewith or therewith and the Lender's rights, powers, privileges, remedies and other interests thereunder and under applicable law, including, without limitation, audit and appraisal fees, insurance premiums, searches, recordation of financing statements, unpaid taxes and other liens, appraisers' and surveyors' fees and expenses, title examination and insurance premiums, surety bond premiums, mortgage recording, documentary, transfer, intangible, note or similar taxes and revenue stamps and filing and recording expenses and charges.

8.5 **WAIVER OF JURY TRIAL. THE BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT, THE NOTE, THE SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT.**

8.6 <u>Covenants to Survive</u>. All covenants, agreements, warranties and representations of the Borrower made herein, in the Note, the Security Agreement and in all other Loan Documents shall survive the execution and delivery of this Agreement, and all such covenants, agreements, warranties and representations shall be binding upon and inure to the benefit of the Borrower and the Lender and its successors and assigns, whether or not so expressed, except that the Borrower may not assign or transfer any of its rights under this Agreement, the Note, the Security Agreement or any other Loan Document without the prior written consent of the Lender.

8.7 <u>Notices</u>. All notices, requests, consents, demands and other communications required or permitted hereunder shall be in writing and shall be deemed to have been given (i) upon receipt when personally delivered or when sent by telegram, telecopy, telex, or, email (with regard to notices of borrowings under <u>Section 2.2</u> hereof only), or (ii) if mailed, on the third day following the day sent by certified or registered mail, return receipt requested, postage prepaid, in each case addressed as follows (or to such other address as may be designated by notice given pursuant to this <u>Section 8.7</u>):

| | |
|---|---|
| The Borrower: | Anchor Tank Lines Corp. |
| | 19-01 Steinway Street |
| | Astoria, New York 11105-1108 |
| | Attention: Leonard Baldari |
| | Facsimile: (__) _____ |
| | |
| With a copy to: | Ciardi Ciardi & Astin |
| | One Commerce Square, Suite 1930 |
| | 2005 Market Street |
| | Philadelphia, PA 19103 |
| | Attention: Albert A. Ciardi III, Esq. |
| | Facsimile: (215) 557-3551 |
| | |
| The Lender: | _____ |
| | _____ |
| | _____ |
| | Attention: |

Facsimile:

With a copy to:    Wachtel & Masyr, LLP
                   One Dag Hammarskjold Plaza
                   885 Second Avenue, 47th Floor
                   New York, New York 10017
                   Attention:  William B. Wachtel, Esq.
                   Facsimile:  (212) 909-9450

Notwithstanding the foregoing, notices to the Lender shall not be effective until received by it.

8.8    Further Assurances.  The Borrower agrees to do such further acts and things and to execute and deliver such statements, assignments, agreements, instruments and other documents as the Lender from time to time may reasonably request in connection with the administration, maintenance, enforcement or adjudication of this Agreement and the other Loan Documents in order (a) to evidence, confirm. perfect or protect any Lien or security interest granted or required to have been granted under this Agreement and the other Loan Documents, (b) to give the Lender confirmation and assurance of the Lender's rights, powers, privileges, remedies and interests granted in and under this Agreement and the other Loan Documents or as provided or permitted by law, or (c) to better enable the Lender to exercise any such right, power, privilege or remedy hereunder, under the other Loan Documents or under law.

8.9    Section Headings; Severability; Entire Agreement.   Section and subsection headings have been inserted herein for convenience only and shall not be construed as part of this Agreement. Every provision of this Agreement, the Note, the Security Agreement and the other Loan Documents is intended to be severable; if any term or provision of this Agreement, the Note, the Security Agreement, or the other Loan Documents shall be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby. All Exhibits and Schedules to this Agreement shall be annexed hereto and shall be deemed to be part of this Agreement. This Agreement and the Exhibits and Schedules attached hereto embody the entire agreement and understanding among the Borrower and the Lender and supersede all prior agreements and understandings relating to the subject matter hereof, except that nothing herein shall terminate or otherwise affect any pledge of collateral heretofore given by the Borrower or any other Person to the Lender.

8.10   **GOVERNING LAW; CONSENT TO JURISDICTION; CERTAIN WAIVERS.**

(a)     **THIS AGREEMENT, THE NOTE, THE SECURITY AGREEMENT AND ALL OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE BORROWER HEREBY SUBMITS TO THE JURISDICTION OF ANY COURT OF THE STATE OF NEW YORK SITTING IN NEW**

YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUIT, ACTION, OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, WHICH IS BROUGHT BY OR AGAINST IT, (I) IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT, (II) TO THE EXTENT THAT IT HAS ACQUIRED, OR HEREAFTER MAY ACQUIRE, ANY IMMUNITY FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS THEREIN, SUCH IMMUNITY IS HEREBY WAIVED TO THE FULLEST EXTENT PERMITTED BY LAW AND (III) AGREES NOT TO COMMENCE ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY TRANSACTION EXCEPT IN SUCH COURT.  THE BORROWER HEREBY WAIVES, AND AGREES NOT TO ASSERT IN ANY SUCH SUIT, ACTION OR PROCEEDING, IN EACH CASE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF ANY SUCH COURT, (B) IT IS IMMUNE FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT ATTACHMENT IN AID OF EXECUTION, EXECUTION OR OTHERWISE) WITH RESPECT TO IT OR ITS PROPERTY (AND FURTHER IRREVOCABLY AGREES THAT SERVICE OF PROCESS AND ALL OTHER LEGAL PROCESS MAY BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF SECTION VI.(b) ABOVE AND THAT SUCH SERVICE SHALL BE SUFFICIENT FOR ALL PURPOSES OF APPLICABLE LAW), OR (C) JURISDICTION OR VENUE FOR ANY SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM.

(b)    THE BORROWER HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES.  THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO THE LENDER'S EXECUTION, DELIVERY AND PERFORMANCE OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT THE LENDER IS RELYING ON THE FOREGOING WAIVERS IN ITS PRESENT AND FUTURE DEALINGS WITH THE BORROWER, ITS SUBSIDIARIES AND AFFILIATES.

[Signature Page to Follow]

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first written above.

ANCHOR TANK LINES CORP.


By: _____
 Name:
 Title:


ANCHOR DIP LENDER LLC

By: _____
 Name:
 Title:

## Exhibit A

### Note

New York, New York

_____, 2010

      FOR VALUE RECEIVED, ANCHOR TANK LINES CORP. hereby unconditionally promises to pay to the order of ANCHOR DIP LENDER LLC (the "Lender") on July 31, 2010, the aggregate unpaid principal amount of all loans made by the Lender to the undersigned pursuant to Section 2.1 of the Agreement (as hereinafter defined). The undersigned further agrees to pay interest from the date hereof on the unpaid principal amount hereof from time to time, and fees on the dates, at the rates and in the manner specified in Section 2.4 of the Agreement. All payments hereunder shall be made at the office of the Lender located at c/o Wachtel & Masyr, LLP, One Dag Hammarskjold Plaza, 885 Second Avenue, 47th Floor, New York, New York 10017, in lawful money of the United States of America and in immediately available funds. The holder of this Note is authorized to enter the date and amount of each Loan (as defined in the Agreement) made by the Lender and the date and amount of each payment or prepayment of principal thereof on the schedule annexed hereto and made a part hereof, and any such recordation shall constitute conclusive evidence of the accuracy of the information so recorded in the absence of manifest error; provided, however, that the Lender's failure to made any such entry shall not limit or otherwise affect the obligations of the maker or any endorser or guarantor of this Note.

      If any payment on this Note becomes due and payable on a day other than a Business Day (as defined in the Agreement), the maturity thereof shall be extended to the next succeeding Business Day, and payments of principal and interest thereon shall be payable at the then applicable interest rate during such extension.

      This Note is the Note referred to in the Credit Agreement dated the date hereof (as the same may be amended, modified, supplemented and/or renewed, the "Agreement") between the undersigned and the Lender and is entitled to the benefits thereof, is secured by the Collateral described therein, and is subject to mandatory prepayment in whole or in part as provided therein. The terms, covenants and conditions of the Agreement and the other Loan Documents are incorporated by reference herein and made a part hereof. Upon the occurrence of any one or more of the Events of Default specified in the Agreement, all amounts then remaining unpaid on this Note may be declared to be, or may automatically become, immediately due and payable all as provided therein.

      Presentment for payment, demand, notice of dishonor, protest, notice of protest and all other demands and notices in connection with the delivery, performance and enforcement of this Note are hereby waived.

      This Note is being delivered in, is intended to be performed in, shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without regard to

principles of conflicts of law (other than Section 5-1401 of the New York General Obligations Law).

IN WITNESS WHEREOF, the undersigned have signed this Note as of the day and year first above written.

ANCHOR TANK LINES CORP.


By: _____
  Name:
  Title:

# LOANS AND PAYMENTS OF PRINCIPAL

| DATE | AMOUNT OF LOAN MADE THIS DATE | AMOUNT OF PRINCIPAL PAID THIS DATE | BALANCE REMAINING UNPAID | NOTATION MADE BY |
|------|------|------|------|------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## Exhibit B

## Borrowing Request

We refer to the Credit Agreement (the "Credit Agreement"), dated as of _____, 2010, by and between Anchor Tank Lines Corp., a Delaware corporation (the "Borrower"), and Anchor DIP Lender LLC, a New York limited liability company (the "Lender"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Credit Agreement.

Pursuant to the Credit Agreement, the Borrower hereby:

1.  Gives notice that on _____,____ it desires to borrow an aggregate principal amount of $_____ from the Lender;

2.  Each of the representations and warranties made by the Borrower in the Credit Agreement are true and correct in all respects on and as of the date hereof as if such representations and warranties had been made on and as of the date hereof and any representation and warranty made as of a specified date earlier than the date hereof shall also have been true and correct in all material respects on and as of such earlier date;

3.  The Borrower is in compliance with all the terms and provisions of the Credit Agreement and the other Loan Documents and no Event of Default or potential Event of Default has occurred or is continuing, nor shall any such event occur by reason of the making of the additional Loan requested herein;

4.  Each of the agreements, covenants and obligations required by the Credit Agreement to be performed or complied with by the Borrower at or before the date hereof has been duly performed or complied with; and

The provisions of the Credit Agreement are incorporated herein by this reference.

IN WITNESS WHEREOF, the undersigned has caused this certificate to be executed this ___ day of _____, ____.

ANCHOR TANK LINES CORP.

By:_____
  Name:
  Title:

## Exhibit C

## Compliance Certificate

To:         Anchor DIP Lender LLC

Date:

Subject:

       In accordance with the Credit Agreement dated June [___], 2010 by and between Anchor Tank Lines Corp. and Anchor DIP Lender LLC (as amended from time to time, the "Credit Agreement"), the undersigned hereby certifies that each of the statements set forth below are true, complete and correct in all respects as of the date of this certificate (this "Certificate"). All terms used in this certificate have the meanings given in the Credit Agreement.

A.     Events of Default. I certify that:

(Check one)

☐     I have no knowledge of the occurrence of an Event of Default under the Credit Agreement.

☐     I have knowledge of an Event of Default under the Credit Agreement as more fully described in the statement of facts attached to this Certificate.

B.     Eligible Accounts Receivable. I further certify that:

1.     The amount of the Eligible Accounts Receivable is $_____.

2.     The amount of Eligible Accounts Receivable was determined as follows:

(a)     Total amount of all accounts:     $_____

Minus

(b)     The sum of the following:

(i)     Amount of accounts unpaid sixty (60) days or more after the invoice date: $_____;

(ii)     Amount of accounts related to goods or services with respect to which Company has received notice of a claim or dispute, which are subject to a claim of offset or a contra account, or which reflect a reasonable reserve for warranty claims or returns: $_____;

(iii)     Amount of accounts not yet earned by the final delivery of goods or that portion of accounts not yet earned by the final

rendition of services by the Borrower to the account debtor: $_____;

   (iv)    Amount of accounts owed by any unit of government, whether foreign or domestic: $_____;

   (v)    Amount of accounts owed by an account debtor who is insolvent or is the subject of bankruptcy proceedings or who has gone out of business: $_____;

   (vi)    Amount of accounts that are subject to any Lien in favor of any Person other than the Lender: $_____; and

   (vii)    Amount of Accounts owed by an account debtor and its affiliates, regardless of whether otherwise eligible, if fifty percent (50%) or more of the total amount of accounts due from such debtor are ineligible: $_____.

      Attached are statements of all relevant facts and computations in reasonable detail sufficient to evidence Company's compliance with the financial covenants referred to above, which computations were made in accordance with GAAP.

ANCHOR TANK LINES CORP.

By:_____
  Name:
  Title:  Chief Financial Officer

**Exhibit D**

**Capital Structure**

**Exhibit E**

**Proposed Interim DIP Order**

**Exhibit F**

**Proposed Motion**

**Exhibit "C"**

# SECURITY AGREEMENT

SECURITY AGREEMENT dated as of _____, 2010 ("Agreement") between ANCHOR TANK LINES CORP., a Delaware corporation (the "Debtor"), and ANCHOR DIP LENDER LLC, a New York limited liability company (the "Secured Party").

## RECITALS

WHEREAS, the Debtor and the Secured Party have entered into a Credit Agreement dated the date hereof (as the same may be amended, modified, supplemented and/or renewed at any time and from time to time, the "Credit Agreement"); and

WHEREAS, it is a condition to the execution, delivery and performance by the Secured Party of the Credit Agreement that the Debtor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, to induce the Secured Party to execute, deliver and perform the Credit Agreement and the other Loan Documents and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Debtor hereby agrees as follows:

1.      Defined Terms.  Capitalized terms used but not defined herein shall have their respective meanings as set forth in the Credit Agreement.  Unless otherwise defined herein, or in the Credit Agreement, terms used in Article 9 of the Uniform Commercial Code of the State of New York (the "UCC") are used herein as defined in the UCC.

2.      Grant of Security.  The Debtor hereby grants to the Secured Party a continuing security interest in and Lien on all of the personal property and fixtures of the Debtor, whether now or hereafter existing or now owned or hereafter acquired and wherever located, of every kind and description, tangible and intangible (the "Collateral"), including, without limitation, the following:

(a)      All equipment in all of its forms, now owned or hereafter acquired wherever located and, in any event, including all machinery and equipment, including processing equipment, conveyors, machine tools, data processing and computer equipment with software and peripheral equipment (other than software constituting part of the Accounts), and all engineering, processing and manufacturing equipment office machinery, furniture, material handling equipment, tools, attachments, accessories, automotive equipment, trailers, trucks, forklifts, molds, dies, stamps, motor vehicles, rolling stock and other equipment of every kind and nature, trade fixtures and fixtures not forming a part of real property, all whether now owned or hereafter acquired, and wherever situated, together with all additions and accessions thereto, replacements therefor, all parts therefor, all substitutes for any of the foregoing, fuel therefor, and all manuals, drawings, instructions, warranties and rights with respect thereto, and all products and proceeds thereof and condemnations awards and insurance proceeds with respect thereto;;

(b)      All inventory in all of its forms, wherever located, including, without limitation, (i) all supplies, goods, incidentals, packaging materials and all other items which contribute to the finished product or to the promotion or sale thereof (ii) all raw materials and work in process, finished goods, and materials used or consumed in manufacture or production,

(iii) goods in which the Debtor has an interest in mass or a joint or other interest or right of any kind (including, without limitation, goods in which the Debtor has an interest or right as consignee), and (iv) goods which are returned to or repossessed by the Debtor, and, with respect to all of the foregoing, all additions thereto, substitutions therefor, accessions thereto and products thereof and (collectively, the "Inventory"), all documents and documents of title, whether relating to or covering any of the foregoing, or otherwise;

(c)     All accounts, accounts receivable, contract rights, chattel paper, instruments, acceptances, notes, drafts, acceptances and other forms of obligations of any kind, now or hereafter existing, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services, together with all ledger sheets, files, records and documents relating to any of the foregoing, including all computer records, programs, storage media and computer software useful or required in connection therewith (collectively, the "Receivables"), and all rights now or hereafter existing in and to all security agreements, leases, and other contracts securing or otherwise relating to any Receivables (other than contracts or agreements which by their terms expressly prohibit the granting of a Lien thereon);

(d)     All rights under all contracts and agreements to which the Debtor is a party (other than contracts or agreements which by their terms expressly prohibit the granting of a Lien thereon, which contracts and agreements are set forth on Schedule 2(d) hereto);

(e)     All trademarks, trade names, trade styles, service marks, prints and labels on which said trademarks, trade names, trade styles and service marks have appeared or appear, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof, or any other country or any political subdivision thereof, together with the goodwill associated therewith, including, but not limited to, those described on Schedule 2(e) hereto, and all reissues, amendments, extensions or renewals thereof and all licenses thereof (collectively, the "Trademarks");

(f)     All letters patent of the United States or any other country, and all applications therefor, all right, title and interest therein and thereto, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Patent and Trademark Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, including, without limitation, those described on Schedule 2(f) attached hereto and made a part hereof, and all reissues, continuations, divisionals, continuations-in-part or extensions thereof and all licenses thereof (collectively, the "Patents");

(g)     All copyrights, copyrighted works or any item which embodies such copyrighted work of the United States or any other country, and all applications therefor, all right, title and interest therein and thereto, and all registrations and recordings thereof, including, without limitation, applications, registrations and recordings in the United States Copyright Office or in any similar office or agency of the United States, any State thereof or any other country or any political subdivision thereof, including, without limitation, those described on

Schedule 2(g) attached hereto and made a part hereof, and all derivative works, extensions or renewals thereof (collectively, the "Copyrights");

(h)     All any accounts maintained by the Debtor at any bank or other financial institution;

(i)     All general intangibles and payment intangibles, including, without limitation, good will and tax refunds;

(j)     All rights and claims in or under any policy of insurance, including, but not limited to, insurance for fire, damage, loss and casualty, whether covering real property or personal property, or tangible or intangible property;

(k)     All other personal property of the Debtor, including, without limitation, all other goods, documents, instruments, general intangibles, investment property (including, without limitation, all securities, security entitlements, securities accounts, commodity contracts and commodity accounts), letters of credit, letter-of-credit rights, money, accounts and chattel paper; and

(l)     All books and records (whether computerized or in any other form or medium), proceeds of any and all of the foregoing Collateral (including, without limitation, proceeds which constitute property of the types described in clauses (a) through (k) of this Section 2) and, to the extent not otherwise included, all payments under insurance (whether or not the Secured Party is the loss payee or additional insured thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the Collateral and products, renewals, replacements, substitutions, additions, accessions, rents, issue, royalties and profits of any and all of the foregoing Collateral, in all cases whether now owned or hereafter acquired or arising.

3.     Security for Obligations.   The Collateral secures the prompt and complete payment and performance when due of the Obligations.

4.     Debtor Remains Liable.   Notwithstanding anything contained herein to the contrary, (a) the Debtor shall remain liable under the contracts and agreements included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of its rights or remedies hereunder shall not release the Debtor from any of its duties or obligations under the contracts and agreements included in the Collateral, and (c) the Secured Party shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the obligations or duties of the Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

5.     Representations and Warranties.   The Debtor represents and warrants to the Secured Party as follows:

(a)     All of the Collateral is located at the addresses specified in Schedule 6(a) hereto.  The chief place of business and chief executive office of the Debtor and the office where the Debtor keeps its books and records concerning the Collateral are located at the address first specified above for the Debtor.

(b)     All originals of all chattel paper, negotiable documents and instruments, including, without limitation, all promissory notes, chattel paper and other instruments contained in the Collateral, have been delivered to the Secured Party.  Except for the foregoing, none of the Receivables or other Collateral is evidenced by chattel paper, negotiable documents or instruments.

(c)     The Debtor owns the Collateral free and clear of any Lien, except for Permitted Liens.  Except for the financing statements filed in connection with Permitted Liens, no effective financing statement or other instrument or other security interest or Lien similar in effect covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to this Agreement.

(d)     The Debtor conducts, and for the past five years has conducted, no business under any name, fictitious name, or trade name, other than Reliable Transit Corp., Mystic Tank Lines or Mystic Materials Management, Inc., which is the Debtor's legal name.  Neither the Debtor nor any of its Subsidiaries are or has been the surviving entity of a merger or consolidation or acquired all or any substantial part of any other Person's business, assets or properties.  Debtor's federal tax identification number is _____.

(e)     Except for the Collateral heretofore delivered to the Secured Party, the Debtor has exclusive possession and control of all Collateral at the addresses specified in Schedule 6(a).

(f)     All Patents, Trademarks and Copyrights, including without limitation, those registered (or for which registration has been applied) with any federal, state, local or foreign Governmental Authority, are listed on Exhibit on Exhibit 6(f).

(g)     This Agreement creates (i) a valid, first priority Lien in all Receivables that arise on or after the date hereof and any other Collateral acquired by the Debtor on or after the date hereof and (ii) a valid Lien that is subject in priority to the Permitted Liens in all other Collateral.  Except for the filing of financing statements under the Uniform Commercial Code of the State of Delaware, all actions necessary to perfect and protect such Lien have been duly taken.  Except for the foregoing, no authorization, approval or other action by, and no notice to or filing with, any Governmental Authority or any other Person (including, without limitation, any holder of any Permitted Lien) is required either (i) for the grant by the Debtor of the Lien granted hereby or for the execution, delivery or performance of this Agreement by the Debtor or (ii) for the perfection of or the exercise by the Secured Party of its rights and remedies hereunder.

6.     Further Assurances.  (a) The Debtor agrees that at any time and from time to time, at the expense of the Debtor, the Debtor will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that the

Secured Party may request, in order to perfect and protect the Lien granted or purported to be granted hereby, or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral. Without limiting the generality of the foregoing, the Debtor will (i) at the request of the Secured Party, mark conspicuously each document, instrument and each agreement included in the Collateral and, at the request of the Secured Party, each of its records pertaining to the Collateral with a legend, in form and substance satisfactory to the Secured Party, indicating that such Collateral is subject to the Lien granted hereby, (ii) if any Receivable or other item of Collateral shall be evidenced by a promissory note, chattel paper or other instrument, deliver such to the Secured Party duly endorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Secured Party and (iii) execute and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Secured Party may reasonably request, in order to perfect and preserve the Lien granted or purported to be granted hereby.

(b) The Debtor hereby authorizes the Secured Party to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral without the signature of the Debtor where permitted by law. A facsimile or photographic or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(c) The Debtor will furnish to the Secured Party at any time and from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Secured Party may reasonably request, all in reasonable detail.

(d) The Debtor will defend the Collateral against all claims and demands of all persons and entities (other than the Secured Party and holders of Permitted Liens) claiming an interest therein. The Debtor will pay promptly when due all property and other taxes, assessments and governmental charges or levies imposed upon, and all claims (including claims for labor, materials and supplies) against, the Collateral.

7.  Certain Covenants. The Debtor shall:

(a) Give the Bank at least 30 days' prior written notice of any change of the Debtor's chief place of business, chief executive office, or the office where it keeps its records concerning the Collateral.

(b) Promptly notify the Secured Party in writing of any loss or damage to the Collateral.

(c) Not use or permit the Collateral to be used for any unlawful purpose or in any violation of any Requirement of Law.

(d) Not permit the Collateral to become a part of or to be affixed to any real property.

(e)     Take all reasonable steps to maintain and enforce the Trademarks, Patents and Copyrights, including but not limited to (i) payment of all fees, (ii) prosecuting infringers if failure to do so would materially and adversely affect the business of Debtor and (iii) diligently pursuing any application or registration material to the business of the Debtor.

(f)     Immediately notify the Secured Party upon incurring or otherwise obtaining a commercial tort claim and, upon the request of the Secured Party, enter into an amendment to this Agreement, in form and substance satisfactory to the Bank, and such other documents and agreements, and take such other action, as the Bank may deem appropriate to grant in favor of the Secured Party a Lien in and to each such commercial tort claim.

(g)     The Debtor shall promptly notify the Bank upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of deposit accounts, investment property, letter-of-credit Rights or electronic chattel paper and, upon the request of the Secured Party, promptly execute such other documents, and do such other acts or things deemed appropriate by the Secured Party to deliver to the Secured Party control with respect to such Collateral; promptly notify the Secured Party upon acquiring or otherwise obtaining any Collateral after the date hereof consisting of documents or instruments and will promptly execute such other documents, and do such other acts or things deemed appropriate by the Secured Party to deliver to the Secured Party possession of such documents which are negotiable and instruments, and, with respect to nonnegotiable documents, to have such nonnegotiable documents issued in the name of the Secured Party; and with respect to Collateral in the possession of a third party, obtain an acknowledgement from the third party that it is holding the Collateral for the benefit of the Secured Party.

8.     <u>Secured Party Appointed Attorney-in-Fact</u>.     The Debtor hereby irrevocably appoints the Secured Party the 'Debtor's attorney-in-fact, with full authority in the place and stead of the Debtor and in the name of the Debtor, after the occurrence and during the continuance of an Event of Default (as hereinafter defined), to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (a) to obtain and adjust insurance required to be maintained pursuant to the Credit Agreement, (b) to ask, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral, (c) to receive, endorse, assign, and collect any and all checks, notes, drafts and other negotiable and non-negotiable instruments, documents and chattel paper, and the Debtor waives notice of presentment, protest and non-payment of any instrument, document or chattel paper so endorsed or assigned, (d) to file any claims or take any action or institute any proceedings which the Secured Party may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of the Secured Party with respect to any of the Collateral, and (e) to sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds or avails thereof, as full and effectually as if the Secured Party were the absolute owner thereof and to otherwise do such acts and things which the Secured Party deems necessary or useful to protect, preserve or realize upon the Collateral and the Secured Party's security interest therein. The powers conferred on the Secured Party hereunder are solely to protect its interests in the Collateral and shall not impose any duty upon it to exercise any such

powers. Neither the Secured Party nor any attorney-in-fact shall be liable for any act or omission, error in judgment or mistake of law provided the same is not the result of gross negligence or willful misconduct. The Debtor hereby ratifies and approves all acts of the Secured Party, as its attorney-in-fact, and the Secured Party, as its attorney-in-fact, will not be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law. These powers, being coupled with an interest, are until all of the Obligations are indefeasibly paid in full and this Agreement is terminated. After the occurrence and during the continuance of an Event of Default, the Debtor also authorizes the Secured Party, at any time and from time to time, to communicate in its own name with any party to any contract, agreement or instrument included in the Collateral with regard to the assignment of such contract, agreement or instrument and other matters relating thereto. The Secured Party may, but shall be under no obligation, to take any of the foregoing actions and the Secured Party shall have no liability or responsibility for any act or omission taken with respect thereto.

9. <u>The Secured Party May Perform</u>. If the Debtor fails to perform any agreement contained herein, the Secured Party may itself perform, or cause performance of, such agreement, and the expenses of the incurred in connection therewith shall be payable by the Debtor.

10. <u>The Secured 'Party's Duties</u>. The powers conferred on the Secured Party hereunder are solely to protect the Secured 'Party's interest in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall not have any duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other Person pertaining to any Collateral.

11. <u>Event of Default</u>. The term "Event of Default" shall mean an Event of Default as such term is defined in the Credit Agreement.

12. <u>Certain Rights relating to Receivables; Remedies; Distribution of Proceeds</u>.

(a) The Secured Party may, at any time and from time to time, whether or not an Event of Default has occurred or is continuing, contact the obligors on Receivables to obtain verification of Receivables. Except as otherwise provided in this Agreement, the Debtor may continue to collect, at its own expense, all amounts due or to become due to the Debtor under the Receivables. In connection with such collections, the Debtor shall take such action as the Secured Party may deem necessary or advisable to enforce collection of the Receivables; <u>provided</u>, <u>however</u>, that, without limiting the generality of any other term or provision of this Agreement, the Secured Party shall have the right at any time, upon written notice to the Debtor, to notify the account debtors or obligors under any Receivables of the assignment of such Receivables to the Secured Party and to direct such account debtors or obligors to make payment of all amounts due or to become due to the Debtor thereunder directly to the Secured Party and, at the expense of the Debtor, to enforce collection of any such Receivables, and to adjust, settle or compromise the amount or payment thereof, in such manner and to such extent as the Secured Party may deem necessary or appropriate. After receipt by the Debtor of the notice from the Secured Party referred to in the <u>proviso</u> to the preceding sentence, (i) all amounts and proceeds (including instruments) received by the Debtor in respect of the Receivables shall be received in

trust for the benefit of the Secured Party hereunder, shall be segregated from other funds of the Debtor and shall be forthwith paid over to the Secured Party in the same form as received (with any necessary endorsement) to be held as cash Collateral or to be applied to the Obligations as determined by the Secured Party, (ii) the Debtor shall not adjust, settle or compromise the amount or payment of any Receivable, or release wholly or partly any account debtor obligor thereof, or allow any credit or discount thereon, other than any discount allowed for prompt payment and (iii) the Debtor shall not withdraw any funds from any accounts maintained by the Debtor at the Secured Party.

(b)     If any Event of Default shall have occurred and is continuing, the Secured Party may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party under the UCC or any Uniform Commercial Code of any applicable jurisdiction, which rights shall be cumulative, and also may (i) require the Debtor to, and the Debtor hereby agrees that it will at its expense and upon the request of the Secured Party, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at a place and time to be designated by the Secured Party, (ii) enter the premises where any of the Collateral is located, completing any work in progress, preparing any Collateral for disposition, disposing of Collateral, taking and carrying away the same, by any of its representatives, with or without legal process, to the Secured 'Party's places of storage and (c) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Secured 'Party's offices or elsewhere, for cash, on credit or for future delivery and upon such other terms as the Secured Party may deem commercially reasonable. At any such sale the Collateral or any portion thereof may be sold in one lot as an entirety or in separate parcels as the Secured Party in its sole discretion deems advisable. The Secured Party may be the purchaser at any such sale if it is public, free from any right of redemption, which the Debtor hereby waives, and payment may be made, in whole or in part, in respect of such purchase price by the application of the Obligations by the Secured Party. The Debtor agrees that, to the extent notice of sale shall be required by law, at least five (5) 'days' notice to the Debtor of the time and place of any public or private sale is to be made shall constitute reasonable notification. The Debtor shall be obligated for, and the proceeds of sale shall be applied first to, the costs of taking, assembling, finishing, collecting, refurbishing, storing, guarding, insuring, preparing for sale, and selling the Collateral, including the fees and disbursements of attorneys, auctioneers, appraisers and accountants employed by the Secured Party. In the event that the proceeds of any sale or other disposition of the Collateral are insufficient to pay in full the Obligations, the Debtor shall remain liable for any deficiency.

13.     Indemnity and Expenses.  (a) Without limiting the generality of any term or provision of any other Loan Document, the Debtor agrees to indemnify the Secured Party from and against any and all claims, losses and liabilities growing out of or resulting from this Agreement (including, without limitation, enforcement of this Agreement).  The Debtor will upon demand pay to the Secured Party the amount of any and all reasonable expenses, including the fees and out-of-pocket disbursements of its counsel and of any experts and agents, which the Secured Party may incur in connection with (i) filing or recording fees incurred in connection with this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection

from, or other realization upon, any of the Collateral, (iii) the exercise or enforcement of any of the rights of the Secured Party hereunder, or (iv) the failure by the Debtor to perform or observe any of the provisions hereof.

14. <u>Notices</u>. Except as otherwise expressly provided in this Agreement, any notice, request, demand or other communication permitted or required to be given hereunder shall be in writing and shall be given in the manner provided in Section 8.7 of the Credit Agreement.

15. <u>Entire Agreement</u>. This Agreement contains the entire agreement with respect to the subject matter hereof and supersedes all prior agreements, written or oral, with respect thereto.

16. <u>Waivers and Amendments; Non-Contractual Remedies; Preservation of Remedies</u>. This Agreement may be amended, superseded, cancelled, renewed or extended, and the terms hereof may be waived, only by a written instrument signed by the Debtor and the Secured Party or, in the case of a waiver, by the Secured Party. No delay on the part of the Secured Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any waiver on the part of the Secured Party of any such right, power or privilege, or any single or partial exercise of any such right, power or privilege, preclude any further exercise thereof or the exercise of any other such right, power or privilege. The rights and remedies herein provided are cumulative and shall not preclude the Secured Party from seeking any other remedy available, whether pursuant to applicable law or otherwise.

17. **<u>GOVERNING LAW; CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL AND CERTAIN OTHER WAIVERS</u>.**

(a) **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW (OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW). THE DEBTOR HEREBY SUBMITS TO THE JURISDICTION OF ANY COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY OR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK FOR THE PURPOSE OF ANY SUIT, ACTION, OR OTHER PROCEEDING ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, WHICH IS BROUGHT BY OR AGAINST IT, (I) IRREVOCABLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN ANY SUCH COURT, (II) TO THE EXTENT THAT IT HAS ACQUIRED, OR HEREAFTER MAY ACQUIRE, ANY IMMUNITY FROM JURISDICTION OF ANY SUCH COURT OR FROM ANY LEGAL PROCESS THEREIN, SUCH IMMUNITY IS HEREBY WAIVED TO THE FULLEST EXTENT PERMITTED BY LAW AND (III) AGREES NOT TO COMMENCE ANY ACTION, SUIT OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY TRANSACTION EXCEPT IN SUCH COURT. THE DEBTOR HEREBY WAIVES, AND AGREES NOT TO ASSERT IN ANY SUCH SUIT, ACTION OR PROCEEDING, IN EACH CASE, TO THE FULLEST EXTENT**

**PERMITTED BY APPLICABLE LAW, ANY CLAIM THAT (A) IT IS NOT PERSONALLY SUBJECT TO THE JURISDICTION OF ANY SUCH COURT, (B) IT IS IMMUNE FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT ATTACHMENT IN AID OF EXECUTION, EXECUTION OR OTHERWISE) WITH RESPECT TO IT OR ITS PROPERTY (AND FURTHER IRREVOCABLY AGREES THAT SERVICE OF PROCESS AND ALL OTHER LEGAL PROCESS MAY BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 14 ABOVE AND THAT SUCH SERVICE SHALL BE SUFFICIENT FOR ALL PURPOSES OF APPLICABLE LAW), OR (C) JURISDICTION OR VENUE FOR ANY SUCH SUIT, ACTION OR PROCEEDING IS IMPROPER OR THAT ANY SUCH SUIT, ACTION OR PROCEEDING IS BROUGHT IN AN INCONVENIENT FORUM.**

        **(b)    THE BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY ACTION, SUIT OR PROCEEDING IN CONNECTION WITH THIS AGREEMENT. THE BORROWER ALSO WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO CLAIM OR RECOVER ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES. THE BORROWER ACKNOWLEDGES THAT THE FOREGOING WAIVERS ARE A MATERIAL INDUCEMENT TO THE BANK'S EXECUTION, DELIVERY AND PERFORMANCE OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT THE BANK IS RELYING ON THE FOREGOING WAIVERS IN ITS PRESENT AND FUTURE DEALINGS WITH THE BORROWER, ITS SUBSIDIARIES AND AFFILIATES.**

        18.    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Secured Party and the Debtor and their respective successors and assigns. This Agreement is not assignable by the Debtor without the prior written consent of the Secured Party.

        19.    <u>Severability</u>. Every provision of this Agreement is intended to be severable.  If any term or provision of this Agreement shall be or be held to be invalid, illegal or unenforceable for any reason whatsoever, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

        20.    <u>Captions</u>.  All section titles or captions contained in this Agreement are for convenience only, shall not be deemed a part of this Agreement and shall not affect the meaning or interpretation of this Agreement.  All references herein to Sections shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.

<div align="center">(page intentionally ends here)</div>

IN WITNESS WHEREOF, the Debtor and the Secured Party have each signed this Agreement as of the date first above written.

ANCHOR TANK LINES CORP.

By: _____
  Name:
  Title:

ANCHOR DIP LENDER LLC

By: _____
  Name:
  Title:

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

CIARDI CIARDI & ASTIN
Albert A. Ciardi, III, Esquire
Jennifer E. Cranston, Esquire
Holly E. Smith, Esquire
Adrienne N. Roth, Esquire
One Commerce Square, Suite 1930
2005 Market Street
Philadelphia, PA 19103
(215) 557-3550
(215) 557-3551 fax
aciardi@ciardilaw.com
jcranston@ciardilaw.com
hsmith@ciardilaw.com
aroth@ciardilaw.com

OLSHAN GRUNDMAN FROME ROSENZWEIG
& WOLOSKY LLP
Michael S. Fox, Esquire
Andrea Fischer, Esquire
Jordanna Nadritch, Esquire
Park Avenue Tower
65 East 55th Street
New York, NY 10022
Direct: 212.451.2256
Facsimile: 212.451.2222
mfox@olshanlaw.com
afischer@olshanlaw.com
jnadritch@olshanlaw.com

| | |
|---|---|
| In Re: | CASE NO. |
| | |
| ANCHOR TANK LINES CORP., | CHAPTER 11 |
|             Debtor. | |

## CERTIFICATE OF SERVICE

I, Albert A. Ciardi, III, Esquire hereby caused on this 3rd day of June, 2010 a true and correct copy of the Debtor's (1) Motion for Interim and Final Orders (A) Authorizing Debtor to Enter into a Secured Debtor-in-Possession Line of Credit, (B) Granting Priority Administrative Expense Claims and Liens Secured by Property of the Estate Pursuant to Sections 363 and 364 of the Bankruptcy Code and (C) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 400, (2) Motion Authorizing the Debtor to Pay Pre-Petition Wages and (3) First Day Affidavit of Leonard Baldari, as indicated below, upon the following:

_____
Albert A. Ciardi, III, Esquire

**VIA Email**
County Oil Co
countyoil@thej.net

Emblem Health/GHI
dvilleck@emblemhealth.com

Martin Rosenman
m.rosenman@yahoo.com

Robert & Kathy Baldari
rbaldari@anchortanklines.com

Robinson Brog Leinward
Goodman@robinsonbrog.com

## VIA FACSIMILE

| To: | | FAX: | |
|-----|---|------|---|
| To: | Davidoff Malito & Hutcher | FAX: | 212-286-1884 |
| To: | Euro American Investment | FAX: | 212-371-0320 |
| To: | Inter City Tire | FAX: | 908-354-1714 |
| To: | Islandwide Auto | FAX: | 631-673-7604 |
| To: | Laber Russo | FAX: | 401-455-7778 |
| To: | Local 553 Benefits Fund | FAX: | 212-741-3701 |
| To: | Marcum & Kliegman | FAX: | 212-981-3001 |
| To: | Morgan Lewis & Bockius | FAX: | 215-963-5501 |
| To: | New York Oil/Heating Ass. | FAX: | 212-594-6583 |
| To: | Premium Finance | FAX: | 508-852-1245 |
| To: | Program Risk Management | FAX: | 518-456-7080 |
| To: | Raich Ende Malter & Co. LLP | FAX: | 516-228-9122 |
| To: | Teamsters Local 469 | FAX: | 732-264-6324 |
| To: | Diane Beckman | FAX: | 631-715-7920 |

| **To:** | Lasker | **FAX:** | 718-459-5397 |
| **To:** | Sweeney | **FAX:** | 617-316-2605 |
| **To:** | Heather Logan | **FAX:** | 516-683-5684 |